**TAVERNS FOR TOTS, INC., Plaintiff,**

**v.**

**CITY OF TOLEDO, et al., Defendants.**

**No. 3:04CV7030.**

United States District Court,
N.D. Ohio,
Western Division.

Oct. 21, 2004.

Steven C. Hales, Lydy & Moan, Sylvania, OH, for Taverns for Tots, Inc., Plaintiff.

Adam W. Loukx, City of Toledo, Department of Law, Barbara E. Herring, City of Toledo, Department of Law, Keith A. Wilkowski, Vassar, Dills & Dawson, Toledo, OH, for City of Toledo, Jack Ford, Mayor, Defendants.

### Order

CARR, District Judge.

This case involves a First Amendment challenge under 42 U.S.C. § 1983. The plaintiff, Taverns for Tots, is an Ohio not-for-profit corporation. Plaintiff claims that the defendants City of Toledo, Ohio, and its Mayor, Jack Ford, have violated the plaintiff's constitutional rights by enactment and enforcement of Toledo's

Clean Indoor Air Act of 2003.[1] That ordinance prohibits smoking in places of public accommodations, subject to certain exceptions, including a exceptions for "membership associations" and "private social functions."

Pending is defendants' motion for summary judgment. For the following reasons, defendants' motion will be granted in full.

This case follows an earlier suit, *D.A.B.E. Inc. v. City of Toledo*, 292 F.Supp.2d 968 (N.D.Ohio 2003), in which several owners of bars and restaurants in Toledo unsuccessfully challenged the facial validity of Toledo's anti-smoking ordinance under the Takings Clause of the federal Constitution.

Plaintiff, a not-for-profit corporation formed on December 20, 2003, has as its ostensible charitable purpose the raising of money for needy children.[2] During the earlier proceedings in this case, I found plaintiff to be a sham corporation, the primary purpose of which was provide a putative legal basis under exemptions in the ordinance for "membership associations" and "private social functions" to enable patrons of Toledo bars and restaurants to smoke. *Taverns for Tots, Inc. v. City of Toledo*, 307 F.Supp.2d 933, 940–43 (N.D.Ohio 2004). On the basis of that finding, I granted a preliminary injunction in the City's favor, enjoining plaintiff from permitting smoking in violation of Toledo's

anti-smoking ordinance at its "events" held in its name. *Id.*

In the instant case, plaintiff claims: 1) the ordinance and the procedures for obtaining an exemption under the ordinance infringe its First Amendment rights of association and speech; 2) the ordinance is unconstitutionally vague because it fails to define "private social function;" 3) state law preempts the ordinance; and 4) the ordinance and its procedures for obtaining an exemption are invalid under the Ex Post Facto Clause of the federal Constitution.

### Standard of Review

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. *Id.* at 323, 106 S.Ct. 2548. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting Fed.R.Civ.P. 56(e)).

---

1. Toledo Mun. Ordinance 509–03, codified at Toledo Mun.Code § 1779.01 et seq. The ordinance amends an earlier ordinance (Toledo Mun.Code § 1779.01 et seq., 1987). Both enactments restrict smoking in enclosed public places.

2. The "members" of plaintiff Taverns for Tots are bar and restaurant patrons, who, on entering one of about thirty-five bars and restaurants that were "sponsors" of Taverns for Tots "events," had to pay a one dollar lifetime "membership fee," were issued a membership card, and became listed on a membership

register kept at the bar or restaurant. Patrons declining to pay the membership fee would be denied service and asked to leave.

Patrons could, if they chose, contribute money to the plaintiff. Aside from the one dollar lifetime fee, no funds were, however, generated by other direct solicitations or mandatory contributions. For a more detailed discussion of the purpose, operation, and actions of the plaintiff, see *Taverns for Tots, Inc. v. City of Toledo*, 307 F.Supp.2d 933 (N.D.Ohio 2004).

Once the burden of production shifts, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is insufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548.

In deciding the motion for summary judgment, the evidence of the non-moving party will be accepted as true, all doubts will be resolved against the moving party, all evidence will be construed in the light most favorable to the non-moving party, and all reasonable inferences will be drawn in the non-moving party's favor. *Eastman Kodak Co. v. Technical Servs., Inc.*, 504 U.S. 451, 456, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992). Summary judgment shall be rendered only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).

## Discussion

### A. First Amendment Freedom of Association/Assembly

■ In Counts II, III, IV, VI, and VIII of its complaint, plaintiff alleges that the "Application for Registration as a Membership Association" required by the Clean Indoor Air Act is "an unreasonable restraint of the right to assemble." Plaintiff has broadly asserted that the application process for obtaining an exemption under the ordinance is unconstitutional because: 1) other organizations have not been required to file such an application; 2) the application requires pre-approval of the or-

ganization; 3) the application contains requirements not rationally related to a legitimate governmental purpose; and 4) the application requires unrelated and intrusive information.

Plaintiff's claim that the application for an exemption acts as an unreasonable restraint on the freedom of assembly must necessarily fail.

The Supreme Court has recognized that individuals have a First Amendment right to associate when they either "enter into and maintain certain intimate human relationship[s]" or "associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion." *Roberts v. United States Jaycees*, 468 U.S. 609, 617–18, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984).

For plaintiff to prevail in its challenge to the constitutionality of the Clean Indoor Air Act on the basis of freedom of association, plaintiff must demonstrate that the ordinance infringes on one of these two protected areas of association.

### 1. Intimate Association

The first circumstance in which the First Amendment protects the right of association, referred to as "intimate association," involves an individual's choice to enter into and maintain human relationships. In recognizing First Amendment protection for such activities the Court has noted that "certain kinds of personal bonds have played a critical role in the culture and traditions of the Nation by cultivating and transmitting shared ideals and beliefs; thereby foster[ing] diversity and act as critical buffers between the individual and the power of the State." *Roberts*, 468 U.S. at 618–19, 104 S.Ct. 3244 (citing *Zablocki v. Redhail*, 434 U.S. 374, 383–86, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978) (recognizing importance of the marriage relationship); *Moore v. East Cleveland*, 431 U.S. 494,

503–04, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) (recognizing importance of family relationships); *Wisconsin v. Yoder*, 406 U.S. 205, 232, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) (recognizing parent-child relationships)). The court has furthermore stated that protecting these relationships "safeguards the ability independently to define one's identity that is central to any concept of liberty." *Id.*

Generally, the types of personal relationships entitled to such protection involve the family: "marriage, childbirth, the raising and education of children, and cohabitation with one's relatives." *Id.* (internal citations omitted). These relationships are characterized by "relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship." *Id.* Because, as a "[g]eneral matter, only relationships with these sorts of qualities are likely to reflect the considerations that have led to an understanding of freedom of association as an intrinsic element of personal liberty," associations lacking these components do not enjoy First Amendment protection. *Id.* at 619, 104 S.Ct. 3244.

There is no bright line distinguishing associations protected as intimate associations and those which are not. *Id.* The Court, instead, views such associations on a spectrum from the most intimate relationships to the most attenuated. *Id.* (citing *Runyon v. McCrary*, 427 U.S. 160, 187–89, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976)). The following factors are relevant to locating an association on the spectrum: "size, purpose, policies, selectivity, congeniality, and other characteristics that in a particular case may be pertinent." *Id.*

The court in *NYC C.L.A.S.H., Inc. v. City of New York*, 315 F.Supp.2d 461 (S.D.N.Y.2004), did not find the requisite degree of intimate association in circumstances factually similar to those in the instant case. The plaintiff, like the plaintiff here, was an organization formed to protect smokers' rights. It alleged that a New York smoking ban interfered with the freedom of association. *Id.* at 467–69.

The plaintiff in *C.L.A.S.H.* did not argue that gathering in bars and restaurants "to engage in social or … business activities while smoking was the type of relationship the U.S. Supreme Court had contemplated" as worthy of First Amendment protection. *Id.* at 473. Likely for the same reasons, plaintiff also did not argue that the bans unduly interfered with "any right of intimacy by smokers." *Id.*

Making this argument in the present case, Taverns for Tots does not exhibit any characteristics of the type of intimate relationships protected by the First Amendment. Plaintiff organization is not small in size: for several weeks before the injunction issued, all the patrons at thirty-five bars and restaurants were "members."[3] There is nothing "selective" about becoming a member: all that is required is payment of the one dollar lifetime "membership fee."

The real purpose of Taverns for Tots is to evade Toledo's anti-smoking ordinance under the guise of raising money for needy children. *See Taverns for Tots*, 307 F.Supp.2d at 944. This is not the kind of intimate associational activity that either enjoys or deserves protection under the First Amendment. *See generally Roberts*, 468 U.S. at 621, 104 S.Ct. 3244 (holding that local chapters of the Jaycees lacked distinctive characteristics that would afford them constitutional protection, namely such organizations were large, unselective

---

**3.** The exact number of "members" cannot be known, because some of the bars and restaurants, contrary to Taverns for Tots protocol, did not keep a comprehensive membership roster.

groups that involved the participation of strangers); *City of Dallas v. Stanglin*, 490 U.S. 19, 24, 109 S.Ct. 1591, 104 L.Ed.2d 18 (1989) ("It is clear beyond cavil that dance-hall patrons, who may number 1,000 on any given night, are not engaged in ... 'intimate human relationships' ").

### 2. Expressive Association

#### a. Direct Impact

■ In the absence of an intimate relationship, plaintiff must base its claim on interference with the ability to associate with others while exercising First Amendment rights. This right of association is known as "expressive association." *See e.g., Anderson v. City of LaVergne*, 371 F.3d 879, 881 (2004); *Stanglin*, 490 U.S. at 25, 109 S.Ct. 1591.

In recognizing an individual's right to associate to engage in activities protected by the First Amendment, the Supreme Court has reasoned: "An individual's freedom to speak, to worship, and to petition the government for the redress of grievances could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed." *Roberts*, 468 U.S. at 622, 104 S.Ct. 3244 (citing *Citizens Against Rent Control/Coalition for Fair Housing v. Berkeley*, 454 U.S. 290, 294, 102 S.Ct. 434, 70 L.Ed.2d 492 (1981)).

■ To be entitled to First Amendment protection, expressive association by a group must involve some form of public or private expression. *Boy Scouts of America v. Dale*, 530 U.S. 640, 648, 120 S.Ct. 2446, 147 L.Ed.2d 554 (2000).

Mere social association is not sufficient, because the Constitution does not recognize a "generalized right of 'social association' " *See Stanglin*, 490 U.S. at 25, 109 S.Ct. 1591. In *Stanglin*, the Supreme Court held that an ordinance restricting attendance at certain dance halls to minors did not infringe on the constitutionally protected right of expressive association. *Id.* at 26, 109 S.Ct. 1591. The court reasoned that teenagers who gathered at the dance halls were mostly strangers, not members of an organized association, who gathered to engage in recreational dancing, not for political, social, economic, educational, religious, or cultural purposes. *Id.* at 25–26, 109 S.Ct. 1591.

In *C.L.A.S.H.* a district court also addressed whether a smoking ban similar to Toledo's anti-smoking ordinance interfered with the right to engage in expressive association. Concluding that the smoking bans at issue did not infringe any recognized First Amendment right, the court noted:

> there is nothing to say that smoking is a prerequisite to the full exercise of association and speech under the First Amendment.... While the Smoking Bans restrict where a person may smoke, it is a far cry to allege that such restrictions unduly interfere with smokers' right to associate freely with whomever they choose in the pursuit of any protected First Amendment activity.

315 F.Supp.2d at 476.

In the present case, plaintiff cannot point to any circumstance where Toledo's Clean Indoor Air Act infringes on its members' First Amendment right of expressive association.

Plaintiff claims to be a charity organized to raise money for the benefit of needy children. The Clean Indoor Air Act and its accompanying exemption application do not interfere with the ability of its members to get together for any lawful purpose, including the exercise of expressive activity related to political, social, economic, educational, religious, or cultural ends. The ordinance only prevents smoking in public places. Under no interpretation of the statute can it be read to prevent plain-

tiff's members from organizing for charitable purposes or discussing those purposes privately or publicly.

The ordinance, moreover, exempts "events" held by "membership associations" from its coverage. If the plaintiff wishes to sponsor such "events," it may do so if an event qualifies for the exemption. By completing an application for an exemption, plaintiff can, if the event qualifies for the exemption, sponsor occasions at which its members may gather together and smoke, if they wish. Plaintiff, however, has never applied for an exemption for any of the "events" held in its name on a daily and nightly basis at the thirty-five restaurants and bars at which such "events" were being held.

In any event, because the ordinance, no matter how applied, cannot infringe on the right of expressive association, defendants are entitled to summary judgment on this aspect of plaintiff's challenge to Toledo's anti-smoking ordinance.

### b. Indirect Impact

■■ Plaintiff further alleges that the process for applying for the "membership association" exemption chills its members' First Amendment freedom of association. Specifically, in Count VI of its complaint,[4] plaintiff contends the application is "over reaching and overbroad" because it, according to plaintiff, requires: 1) "voluminous and unrelated information" about the business of Taverns for Tots, Inc. from

sources not relevant to raising money for children or preventing tobacco smoke exposure;" and 2) "voluminous, unrelated and intrusive information required on the facility in which Plaintiff may hold a private event, private function or private social function."[5]

Plaintiff correctly asserts that the compelled disclosure of certain information can unlawfully interfere with one's First Amendment freedom of association. *See NAACP v. State of Alabama*, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). The information required in the application for exemption under the Clean Indoor Air Act, however, does not act as an unlawful restraint on plaintiff's members' right of freedom of association.

In *NAACP*, the Alabama affiliates of the NAACP failed to comply with Alabama's qualification statute which required foreign corporations to qualify before doing business in the state. *Id.* at 451–52, 78 S.Ct. 1163. Alabama brought suit against the NAACP seeking to enjoin it from conducting further activity within the state. *Id.* at 452, 78 S.Ct. 1163.

During the course of the litigation, the court ordered the NAACP to produce a variety of documents, including bank statements, leases, deeds, and records of the names and addresses of its members and agents. *Id.* at 453, 78 S.Ct. 1163. Though the NAACP substantially complied with much of the production order, it refused to

4. Plaintiff's complaint includes two counts labeled "Count Six" which are nearly identical. Both counts launch overbreadth challenges to the application and allege that the application serves as an "unreasonable restraint of the right to assemble and an unlawful impairment of the right to free speech."

5. Although plaintiff uses the language "overbroad," I do not find plaintiff to be challenging the ordinance based on overbreadth grounds. The overbreadth doctrine provides: "a governmental purpose to control or pre-

vent activities constitutionally subject to state regulation may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms." *Karlan v. Cincinnati*, 416 U.S. 924, 925, 94 S.Ct. 1922, 40 L.Ed.2d 280 (1974) (citing *Zwickler v. Koota*, 389 U.S. 241, 250, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967)). Plaintiff's contention appears to be that the application requires too much information, and thus, plaintiff's argument is more properly construed as a freedom of association challenge.

disclose its membership list. Compelled disclosure of the membership list, the NAACP asserted, abridged the rights of its members to associate in support of their beliefs. *Id.* at 454, 460, 78 S.Ct. 1163.

The Supreme Court held that requiring disclosure of the membership lists was likely to act as a restraint on its members' freedom of association. *Id.* at 462–63, 78 S.Ct. 1163. Revealing such lists in the past had, the NAACP showed, "exposed these members to economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility." *Id* at 462, 78 S.Ct. 1163. In light of this showing, the Court stated:

> Under these circumstances, we think it apparent that compelled disclosure of petitioner's Alabama membership is likely to affect adversely the ability of petitioner and its members to pursue their collective effort to foster beliefs which they admittedly have the right to advocate, in that it may induce members to withdraw from the Association and dissuade others from joining it because of fear of exposure of their beliefs shown through their associations and of the consequences of this exposure.

*Id.*

The Court then considered Alabama's interest in obtaining the membership lists, and found Alabama had no legitimate interest in obtaining the list. *Id.* at 463, 466, 78 S.Ct. 1163.

Toledo's procedures for seeking and obtaining a "membership association" exemption, though requiring disclosure of a "membership association's" officers when applying for such exemption, do not request a list of the group's members. Requiring disclosure of an association's officers is not impermissible. *See NAACP*, 357 U.S. at 464, 78 S.Ct. 1163.

Moreover, the City of Toledo, unlike the state of Alabama in *NAACP*, has a legitimate interest in seeking this information. Toledo's City Council passed the ordinance prohibiting smoking in most public places to protect individuals from the harmful effects of tobacco smoke. Although the City provided certain exemptions under the statute, including those for "membership associations" and "private social functions," the City has a legitimate interest in ensuring that the exemptions do not swallow the rule.

The City has a valid interest in ensuring that "membership associations" seeking an exemption are actual associations with an office, officers, members, membership criteria, and other attributes of a *bona fide* organization. Additionally, in the interest of enforcing the ordinance, the City has legitimate need to know when and where a "membership association" is holding an event in which smoking will be permitted. It is only with this information that the City can ensure that the ordinance is being enforced adequately and properly.

In the absence of a valid intimate or expressive association claim, defendants' motion for summary judgment on plaintiff's First Amendment freedom of association claim must be granted.

## B. First Amendment Freedom of Speech

Plaintiff's complaint also alleges that requiring an application for an exemption under the Clean Indoor Air Act infringes on its members' First Amendment freedom of speech.

■ Plaintiff has not clearly articulated the manner in which the application required under the Clean Indoor Air Act conflicts with free speech. Plaintiff's claim must, in any event, fail because smoking is not sufficiently expressive conduct to warrant First Amendment protection.

### 1. Conduct Meriting First Amendment Protection

The Supreme Court has recognized that conduct may be sufficiently expressive to merit First Amendment protection. *See, e.g., Hurley v. Irish–American Gay, Lesbian & Bisexual Group of Boston,* 515 U.S. 557, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995) (marching in a parade); *United States v. Eichman,* 496 U.S. 310, 110 S.Ct. 2404, 110 L.Ed.2d 287 (1990) (burning the United States flag); *Cohen v. California,* 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971) (wearing a jacket with an expletive regarding the draft).

That some conduct may enjoy First Amendment protection, such protection does not extend to all conduct. "It is possible to find some kernel of expression in almost every activity a person undertakes—for example, walking down the street or meeting one's friends at a shopping mall—but such a kernel is not sufficient to bring the activity within the protection of the First Amendment." *Stanglin,* 490 U.S. at 25, 109 S.Ct. 1591.

■ To determine if conduct is sufficiently expressive to warrant First Amendment protection, I must consider "whether an intent to convey a particularized message was present and [whether] the likelihood was great that the message would be understood by those who viewed it." *Texas v. Johnson,* 491 U.S. 397, 404, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989).[6] In this case, this means inquiring whether smoking in a bar or restaurant is "expressive" (i.e., whether, by smoking, the patron intends to convey a message, and, if so, whether such message is likely to be understood by those who observe the patron as he or she smokes).

The court in *C.L.A.S.H.* considered this issue, and was not persuaded that smokers "light up" to send a message. 315 F.Supp.2d at 478. Instead, the court concluded that the prevailing motivation for smoking was nonexpressive. *Id.* at 476.

This could have ended the inquiry, but the court in that case also considered the likelihood that any message that the smoker may have intended to convey would be understood by an observer who saw the patron smoking. *Id.* Concluding that the message would be vague, the court stated: "[c]ertainly if opposition to the Smoking Bans is the message, then its receipt would be better assured if conveyed in a more appreciable context, such as City Hall, Gracie Mansion, or the State Capital, where it would be so understood and possibly protected." *Id.* at 479.

I conclude that simply smoking in a bar or restaurant is not sufficiently expressive to enjoy First Amendment protection. In this case, moreover, there is no reason to believe that plaintiff's members, when smoking at "events" held under plaintiff's aegis, intend to communicate a message about plaintiff's fund-raising purpose or activities.

### 2. Content–Based and Content–Neutral Restrictions

■ Even if smoking in a bar or restaurant were intended to convey a

---

**6.** I note that the Supreme Court relaxed the requirement that the message be particularized in *Hurley v. Irish–American Gay, Lesbian & Bisexual Group,* 515 U.S. 557, 569, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995) ("As some of these examples show, a narrow, succinctly articulable message is not a condition of constitutional protection, which if confined to expressions conveying a 'particularized mes-

sage ... would never reach the unquestionably shielded painting of Jackson Pollock, music of Arnold Schoenberg, or Jabberwocky verse of Lewis Carroll.' "). I do not, however, interpret *Hurley* as completely eliminating the requirement that the conduct is undertaken to convey some message. *See Church of the Am. Knights of the KKK v. Kerik,* 356 F.3d 197, 205 (2d Cir.2004).

message that observers understood, Toledo's anti-smoking ordinance would not impermissibly impair free speech. The First Amendment prohibits the government from legislating against speech based on its content. *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 96, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972). Content-based governmental restrictions on speech are, accordingly, presumed invalid and scrutinized strictly. *See United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 817, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000) (citing *R.A.V. v. St. Paul*, 505 U.S. 377, 382, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992)).

Unlike content-based restrictions, content-neutral restrictions are subject to a less strict, or "intermediate level" scrutiny. *See Bartnicki v. Vopper*, 532 U.S. 514, 545, 121 S.Ct. 1753, 149 L.Ed.2d 787 (2001); *Playboy*, 529 U.S. at 813, 120 S.Ct. 1878. Content-neutral restrictions on free speech are upheld under an intermediate level of scrutiny if such restrictions are substantially related to an important governmental interest. *Ward v. Rock Against Racism*, 491 U.S. 781, 798–99, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989).

The principal inquiry in determining whether a restraint on speech is content-neutral is the government's purpose in imposing the restraint: a restraint that regulates expressive activity is content-neutral if it serves purposes unrelated to the content of the expression. *Id.* at 791, 109 S.Ct. 2746.

Assuming, *arguendo*, that Toledo's anti-smoking ordinance regulates free speech,[7] the ordinance is content neutral. The ordinance does not prohibit plaintiff's

members from giving money to charity as a form of speech or expression. Nor does the ordinance prohibit plaintiff's members from smoking while donating to charity as a form of expression, provided plaintiff has sought and obtained an exemption.

The ordinance, moreover, does not specifically target the content of any expressive conduct. Even assuming that smoking might constitute expressive conduct, it may express a variety of emotional states, such as addiction, indifference to good health, anxiety, despair, defiance, relaxation, or satisfaction. The ordinance does not, however, prohibit smoking in places of public accommodation in order to restrict the expression of such emotions, even if the smoker wants to communicate them to an observer: instead, the ordinance prohibits all smoking, regardless of any message the smoker might want to convey.

As importantly, the ordinance does not prohibit smoking always and everywhere: it simply bars smoking in enumerated areas. Smokers can smoke in many other places, such as public streets, plazas, and parks, their own homes and their environs, hotel and motel rooms, and even in bars and restaurants of a certain size, or which have constructed smoking lounges meeting the ordinance's requirements. Toledo Mun.Code § 1779.04.

In summary, Toledo's anti-smoking ordinance is content-neutral and its prohibition of smoking in places of public accommodation is reasonable in terms of time, place, and manner. The ordinance is substantially related to the important governmental interest of protecting individuals from the harmful effects of tobacco smoke. Plain-

---

7. The plaintiff has not, however, presented any evidence that the ordinance is directed to restraining expressive utterances or conduct. Instead, by its own terms, the ordinance is directed at the act of smoking in public places

and at protecting individuals from the harmful effects of exposure to tobacco smoke. Toledo Mun. Ordinance 509–03, Summary & Background (July 8, 2003).

tiff's First Amendment free speech claim is without merit.

## C. Vagueness

■ Count I of plaintiff's complaint alleges that the Clean Indoor Air Act is unconstitutionally vague because it fails to define "private social function."

■ The void-for-vagueness doctrine, embodied in the Due Process Clause of the Fourteenth Amendment, invalidates any legislation that "either forbids or requires the doing of an act in terms so vague that [persons] of common intelligence must necessarily guess at its meaning and differ as to its application." *Roberts,* 468 U.S. at 629, 104 S.Ct. 3244 (quoting *Connally v. General Constr. Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926)).

The requirement that the government express its laws with clarity ensures that state power is "exercised only on behalf of policies reflecting an authoritative choice among competing social values," reduces the chance of discrimination in the administration of laws, enables individuals to conform their conduct to the law; and "permits meaningful judicial review." *Id.* The void-for-vagueness doctrine also keeps vague statutes from inhibiting individuals from exercising protected freedoms—the concern being that "[u]ncertain meanings inevitably lead citizens to 'steer far wider of the unlawful zone ... than if the boundaries of the forbidden areas were clearly marked.'" *Karlan v. Cincinnati,* 416 U.S. 924, 925, 94 S.Ct. 1922, 40 L.Ed.2d 280 (1974) (citing *Grayned v. City of Rockford,* 408 U.S. 104, 109, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972)).

As previously stated, plaintiff bases its vagueness argument on the failure to define "private social function" as used in § 1779.04, which is entitled "Exemptions." This section creates several exceptions to the restrictions on smoking set forth in the two previous sections. Toledo Mun.Code § 1779.04(a). Among these are is the ex-

emption in § 1779.04(a)(1) for membership associations and private social functions. That subsection states:

(a) Exemptions. The restrictions in Sections 1779.02 and 1779.03 shall not apply to:

(1) An entire room or hall which is being used by a membership association or for a private social function, provided that the event is under the control of the sponsor of the function, the general public is not invited . . . ."

As plaintiff correctly notes, the ordinance does not define "private social function." This failure does not render the ordinance impermissibly vague. In view of the language of the ordinance and its legislative purpose, I find it to be clear, unambiguous, and easily understood by persons of common intelligence.

The stated legislative purpose of the ordinance is "to further restrict smoking in public places." Toledo Mun. Ordinance 509–03, Summary & Background (July 8, 2003). As a basis for these restrictions, the Toledo City Council cited scientific evidence of the "harmful effects of exposure to secondary tobacco smoke" and stated that "the majority of citizens of the City of Toledo are non-smokers who are annoyed and offended by secondary tobacco smoke." *Id.*

The language of the ordinance is clear: the ordinance prohibits smoking in public places. It specifically lists several examples of "public places," including retail stores and service establishments, public transportation, enclosed theaters, auditoriums, concert halls, arenas and public meeting rooms, elevators, stairwells, hallways, public restrooms, courtrooms, jury waiting rooms and deliberation rooms, educational facilities, polling places, health care facilities, gymnasiums, exercise rooms, health spas, libraries, museums, aquariums, and galleries. Toledo Mun.Code § 1779.02(a)(1)-(13).

In an effort to further clarify the intent and design of the ordinance, City Council defined "public place" as "that portion of any enclosed indoor area to which members of the general public are invited or in which members of the general public are permitted." Toledo Mun.Code § 1779.01(p). The City Council offered additional insight into its intent by excluding from the restrictions those portions of "public places" which are not normally held open to "members of the general public."[8] *See* Toledo Mun.Code § 1779.02(a).

The language following "private social function," while not directly defining the term, provides some insight into its meaning by stating that such function must be "under the control of the sponsor" and "the general public cannot be invited." The word "private," as used in the ordinance means the opposite of "public." Arguably, the type of function is irrelevant; whether the function is a wedding reception, a graduation celebration, or a meeting of a common interest group, the event may only be exempted from the ordinance provided the event is private (i.e., under the control of the sponsor and is not held open to the general public).

Based on the clear language and legislative purpose of the ordinance, I find that the ordinance informs persons of ordinary intelligence as to what they need to do to comply with the law. Toledo's anti-smoking ordinance is, accordingly, not void for vagueness.[9]

### D. Preemption

■ Plaintiff alleges in Count V of its complaint that the application procedures for obtaining an exemption are preempted by Revised Code § 1701 et seq.[10] Plaintiff argues corporations are "creatures of State Law" and as such, municipalities are preempted from "approving" the validity of a corporation. Therefore, plaintiff reasons, the City of Toledo lacks subject matter jurisdiction to enforce the application requirement. Plaintiff's argument is entirely without merit.

As the Ohio Supreme Court noted in *Weir v. Rimmelin,* 15 Ohio St.3d 55, 56, 472 N.E.2d 341 (1984), Ohio's Constitution has a "home rule" provision conferring "a significantly high degree of sovereignty" on municipalities. Section 18.03 of the Ohio's Constitution states: "[m]unicipalities shall have authority to exercise all powers of local self-government and to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws."[11]

---

**8.** "Members of the general public" is defined in the ordinance as "... shoppers, customers, patrons, patients, students, clients and other similar invitees of any establishment and excludes employees thereof, sales representatives, service repair persons and persons delivering goods, merchandise or services to such establishment." Toledo Mun.Code § 1779.01(j).

**9.** I note that two bar owners who were charged with violating the ordinance raised the same vagueness challenge in *City of Toledo v. Bollin,* Nos. CRB–04–05037, CRB–04–05386 (Toledo Mun. Ct. May 14, 2004). Employing similar reasoning, the Hon. C. Allen McConnell found that the ordinance was not "unconstitutionally vague and that persons of

ordinary intelligence are informed by reading the statute as to the standard of conduct that would be required of persons who operate bars or other similar facilities." *Id.* at 4.

**10.** In *D.A.B.E., Inc. v. City of Toledo,* 292 F.Supp.2d 968, 973 (2003), I addressed a similar preemption issue—whether the Clean Indoor Air Act was preempted by a state law regulating smoking in defined "places of public assembly."

**11.** Revised Code § 715.37 also specifically authorizes municipalities, under the police power, "to provide for the public health." Under this power, the authority of municipalities to regulate a variety of areas has been upheld:

The City of Toledo, acting within its authority to provide for the public health, originally restricted smoking in public places in 1987 in the Clean Indoor Air Ordinance. On July 8, 2003, the City Council passed additional restrictions, which give rise to this lawsuit.

In adopting these additional restrictions, City Council reasoned:

> In 1987 the City of Toledo enacted the Clean Indoor Air Ordinance, which restricted smoking in work places and public places including restaurants. Since the passage of that ordinance, scientific evidence has demonstrated the harmful effects of exposure to secondary tobacco smoke. Further, the majority of citizens of the City of Toledo are non-smokers who are annoyed and offended by secondary tobacco smoke. This ordinance will further restrict smoking in public places to areas which are entirely enclosed.

Toledo Mun. Ord. 509–03, Summary & Background (July 8, 2003).[12]

In light of the public health concerns motivating enactment of the anti-smoking ordinance, I find that the City, when it enacted the ordinance, acted within its police powers to protect public health.[13]

■■■ A local ordinance is generally valid if it is consistent with related state statutes. *Weir*, 15 Ohio St.3d at 57, 472

> [L]aws relating to child labor, minimum wages for women and minors and maximum hours for women and minors have all been upheld on the basis of the police power in relation to public health. Regulations relating to control of venereal disease, blood tests for marriage licenses, sterilization, pasteurization of milk, chlorination of water and vaccination have all been held valid as based on police power exercised in regard to public health.
>
> *City of Canton v. Whitman*, 44 Ohio St.2d 62, 67, 337 N.E.2d 766 (1975) (citing *Kraus v. Cleveland*, 163 Ohio St. 559, 562, 127 N.E.2d 609 (1955)).

N.E.2d 341. Such regulations, however, "must yield to general laws of statewide scope and application, and statutory enactments representing the general exercise of police power by the state prevail over police and similar regulations in the exercise by a municipality of the powers of local self-government." *City of Canton v. Whitman*, 44 Ohio St.2d 62, 65, 337 N.E.2d 766 (1975) (citing *State ex. Rel. Klapp v. Dayton P. & L. Co.*, 10 Ohio St.2d 14, 225 N.E.2d 230 (1967) (paragraph one of the syllabus) (1967)).

■■■ Although the "home rule" provision grants municipalities self-governing authority, municipalities do not have absolute power. *Weir*, 15 Ohio St.3d at 56, 472 N.E.2d 341 (citing *Canton*, 44 Ohio St.2d at paragraph one of the syllabus). Municipal ordinances are invalid where they conflict with a general state statute. *Id.* at 57, 472 N.E.2d 341.

■■■ To determine whether an ordinance is in conflict with a general state law, the test is " 'whether the ordinance permits or licenses that which the statute forbids and prohibits, and vice versa.' " *D.A.B.E.*, 292 F.Supp.2d at 973 (quoting *Middleburg Heights v. Ohio Bd. of Bldg. Standards*, 65 Ohio St.3d 510, 512, 605 N.E.2d 66 (1992)); *see also Weir*, 15 Ohio St.3d at 57, 472 N.E.2d 341.

**12.** I have also recognized that the harmful effects of secondary tobacco smoke are well known. *See Taverns for Tots, Inc., supra*, 307 F.Supp.2d at 945.

**13.** Although the Ohio Supreme Court held in *D.A.B.E., Inc. v. Toledo–Lucas Cty. Bd. of Health*, 96 Ohio St.3d 250, 773 N.E.2d 536 (2002) that a county board of health lacks authority to enact a smoking ban, this decision is not controlling on the issue of a city's authority to regulate smoking pursuant to its police powers.

Plaintiff contends that the application process under the anti-smoking ordinance conflicts with Ohio's general corporation law, O.R.C. § 1701 et seq., by imposing requirements on a corporation's ability to do business in Toledo that are not found in the Revised Code. Section 1701 et seq. set forth the statutory framework for Ohio's general corporation law and the requirements that a corporation must meet to do business in Ohio.

According to the plaintiff, the application process established by the City's Division of Environmental Services, which is charged with administering the ordinance, impermissibly adds to the prerequisites under the Revised Code for doing business. I disagree: the City does not impose this requirement on all corporations: it imposes it only on those wishing to sponsor "events" at which smoking may occur.

The application process furthers the purposes of the anti-smoking ordinance by helping to ensure that only *bona fide* corporations, and not sham entities like the plaintiff, qualify for the exemption. Absent such process, the exemptions might be abused, and create a loophole in the law and its enforcement.

The City's application process in no way conflicts with Ohio general corporation law. In the absence of any conflict, defendants' motion for summary judgment on plaintiff's preemption claim must be granted.

### E. Ex Post Facto

■ In Court VII of its complaint, plaintiff alleges the application required under Toledo Municipal Code § 1779 et seq. for "membership associations" "is not in its final form," and contends the application form has been amended on at least one occasion *after being given to plaintiff.* Plaintiff further argues that as a result of the delay in finalizing the application, the plaintiff will be subjected to "ex post facto

amendments" and will be "unduly burdened and prejudiced if it is required to complete numerous versions of such application."

■ I disagree. Article I, § 10, of the United States Constitution forbids the states from passing any "ex post facto Law." *Cal. Dep't of Corr. v. Morales,* 514 U.S. 499, 504, 115 S.Ct. 1597, 131 L.Ed.2d 588 (1995). The ex post facto clause ensures that: 1) individuals are given "fair warning" of the effect of legislation and the ability to rely on the meaning of such legislation until changed; 2) the separation of powers is maintained; and 3) individuals are protected from injustice and tyranny. *Carmell v. Tex.,* 529 U.S. 513, 532, 120 S.Ct. 1620, 146 L.Ed.2d 577 (2000).

In *Calder v. Bull,* 3 U.S. 386, 390–91, 3 Dall. 386, 1 L.Ed. 648 (1798), Justice Chase set forth four categorical descriptions of ex post facto laws which the Constitution prohibits:

I will state what laws I consider ex post facto laws, within the words and the intent of the prohibition. 1st. Every law that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action.2d. Every law that aggravates a crime, or makes it greater than it was, when committed.3d. Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed. 4th. Every law that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offence, in order to convict the offender.

The Supreme Court recently confirmed the vitality and efficacy of these categories in *Stogner v. California,* 539 U.S. 607, 609, 612, 123 S.Ct. 2446, 156 L.Ed.2d 544 (2003).

■ The expost facto clause, therefore, applies only to statutes that are criminal or penal in nature. The question of whether a particular statutory penalty is civil or criminal is a matter of statutory construction. *United States v. Ward*, 448 U.S. 242, 248, 100 S.Ct. 2636, 65 L.Ed.2d 742 (1980) (citing *One Lot Emerald Cut Stones v. United States*, 409 U.S. 232, 237, 93 S.Ct. 489, 34 L.Ed.2d 438 (1972)).

■ Once a statute has been determined to be criminal or penal, the statute must meet "[t]wo critical elements" for the statute to be considered ex post facto—"it must be retrospective, that is, it must apply to events occurring before its enactment, and it must disadvantage the offender affected by it." *Weaver v. Graham*, 450 U.S. 24, 29, 101 S.Ct. 960, 67 L.Ed.2d 17 (1981) (citing *Lindsey v. Washington*, 301 U.S. 397, 401, 57 S.Ct. 797, 81 L.Ed. 1182 (1937); *Calder*, 3 U.S. at 390, 3 U.S. 386)).

The plaintiff has provided no basis for its contention that the Clean Indoor Air Act violates the Constitution's prohibition against ex post facto laws. Nonetheless, I will assume, *arguendo*, that the ordinance is penal. Even if the ordinance is penal, the ex post facto clause has no relationship to the application process about which the plaintiff complains.

The ordinance itself does not describe the procedures for seeking an exemption from the ordinance as a "membership association;" the ordinance gives the Division of Environmental Services the authority to make rules detailing the registration process. As of the effective date of the ordinance, August 22, 2003, or within forty-five days of its passage on July 8, 2003, the plaintiff could not lawfully hold a charitable event at which smoking was permitted without seeking an exemption pursuant to the rules of the Division of Environmental Services. That no application process was in place by the deadline may or may not raise due process concerns. That fact does not, however, raise any ex post facto issues.

The ordinance and its application process are not retrospective because the ordinance does not penalize past conduct. To be retrospective, the ordinance must punish plaintiff for permitting smoking at an event that took place before its effective date. The ordinance has no such effect.

The application process, moreover, does not disadvantage plaintiff. Instead, it enables the plaintiff to sponsor fund-raising and other events lawfully, without risking imposition of the ordinance's penalties.

The Clean Indoor Air Act does not violate the ex post facto clause, and defendants' motion for summary judgment at to this claim must be granted.

### F. Defendants' Counterclaim for Permanent Injunctive Relief

■ Based on the reasoning set forth in *Taverns for Tots, Inc. v. City of Toledo*, 307 F.Supp.2d 933 (N.D.Ohio 2004), in which I granted defendants preliminary injunctive relief enforcing the Clean Indoor Air Act, and in light of plaintiff's continued failure to comply with the Clean Indoor Air Act and the related rules adopted by the City of Toledo Division of Environmental Services, I find that defendants are entitled to summary judgment on their counterclaim and their request for permanent injunctive relief against plaintiff.

### Conclusion

In light of the foregoing, it is

ORDERED THAT

1. Defendants' motion for summary judgment as to all counts in plaintiff's complaint be, and the same hereby is, granted;

2. Defendants' motion for summary judgment as to its counterclaim be, and the same hereby is granted;

3. Defendants' motion for a permanent injunction be, and the same hereby is granted: the preliminary injunction previously entered in this case is hereby made permanent, so that:

Taverns for Tots, Inc., its directors, officers, employees, agents, members, and all persons or entities acting in concert with, in the name of, or under either the aegis or actual or putative sponsorship of Taverns for Tots, Inc., including but not limited to establishments such as "bars" and "eating establishments," as defined in Toledo Municipal Code § 1779.01, and their owners, directors, officers, and agents and others acting in concert with them or on their behalf, be and hereby are enjoined and restrained from permitting smoking at their "events" or other activities held by, in conjunction with or furtherance of Taverns for Tots, Inc., or in the name of or under aegis of Taverns for Tots, Inc., in violation of Toledo's Clean Indoor Air Act of 2003, Toledo Mun.Code § 1779 et seq., unless and until Taverns for Tots, Inc., applies for and is granted an exemption as a "Membership Association" or otherwise pursuant to § 1779.04 of the ordinance, and is certified as exempt from the ordinance by the City of Toledo Division of Environmental Services;

4. Within ten days of the entry of this Order, plaintiff Taverns for Tots shall cause a copy of this Order to be served on all owners, proprietors, operators, or others responsible for the management of any and all bars and restaurants in the City of Toledo known to plaintiff, or as to which plaintiff has reason to know, as having, at any time since enactment of the Toledo Clean Indoor Air Act of 2003, held an "event" or similar function in the name or under aegis of, or pursuant to the actual or putative sponsorship of plaintiff Taverns for Tots; and

5. Taverns for Tots shall certify its compliance with the foregoing duty to make service within twenty days of the date of this order, and include in such certification, a list of the names and addresses of all persons on whom service was made in compliance with this order.

So ordered.