**CURIOUS THEATER COMPANY, a Colorado non-profit company; Paragon Theatre, a Colorado non-profit company; and Theatre 13, Inc., a Colorado non-profit company, Plaintiffs–Appellants,**

v.

**COLORADO DEPARTMENT OF PUBLIC HEALTH AND ENVIRONMENT; and Dennis E. Ellis, Executive Director, Defendants–Appellees.**

No. 06CA2260.

Colorado Court of Appeals,
Div. II.

March 20, 2008.

Holland & Hart, LLP, A. Bruce Jones, Daniel R. Pabon, Denver, Colorado, for Plaintiffs–Appellants.

John W. Suthers, Attorney General, Robert C. Douglas, Jr., First Assistant Attorney General, Alisa Campbell, Assistant Attorney General, Lisa Brenner Freimann, Assistant Attorney General, Denver, Colorado, for Defendants–Appellees.

Levine, Sullivan, Koch, & Schulz, LLP, Steven D. Zansberg, Denver, Colorado; Davis, Wright, Tremaine, L.L.P., Bruce E.H. Johnson, John Sherman, Seattle, Washington, for Amicus Curiae Theatre Communications Group.

Opinion by Judge BERNARD.

Plaintiffs, Curious Theatre Company, Paragon Theatre, and Theatre 13, Inc. (collectively, the Theaters), appeal the judgment denying their request for a preliminary injunction and a declaratory judgment against the enforcement of the Colorado Clean Indoor Air Act, sections 25–14–201 to –209, C.R.S.2007 (the Smoking Ban), by the Colorado Department of Health and Environment and its Executive Director, Dennis Ellis (collectively, the Health Department), as applied to theatrical productions.

This case involves the question whether the Smoking Ban violates the Theaters' rights under the First Amendment and Colorado Constitution article II, section 10 because it precludes conduct—namely, smoking—that may be presented as part of certain theatrical productions. Because we conclude the Theaters' constitutional rights are not violated by the application of the Smoking Ban to them, we affirm.

## I. Background

The Smoking Ban became effective on July 1, 2006. § 25–14–201, C.R.S.2007; Ch. 22, sec. 9, 2006 Colo. Sess. Laws 63. It prohibits smoking "in any indoor area, including . . . [a]ny place of employment that is not exempted . . . [and] [t]heaters." § 25–14–204(1)(k)(I), (x), C.R.S.2007. "Place of employment" refers to "any indoor area or portion thereof under the control of an employer in which employees of the employer perform services for, or on behalf of, the employer." § 25–14–203(12), C.R.S.2007.

The Smoking Ban covers all smoking, not just cigarette smoking. § 25–14–203(16), C.R.S.2007 (" 'Smoking' means the burning of a lighted cigarette, cigar, pipe, or any other matter or substance that contains tobacco."); § 25–14–203(17), C.R.S.2007 (" 'Tobacco' also includes cloves and any other plant matter or product that is packaged for smoking.").

The facial constitutionality of the Smoking Ban was unsuccessfully challenged on due process and equal protection grounds in *Coalition for Equal Rights, Inc. v. Ritter*, 517 F.3d 1195, 1197 (10th Cir.2008).

In October 2006, the Theaters sought a judgment declaring the Smoking Ban unconstitutional under both the federal and state constitutions and prohibiting its enforcement because they wished to present plays in which characters smoked. The trial court denied their request after the Theaters set forth their evidence, but before the Health Department presented any evidence. The court ruled that "smoking, standing alone, including in the theatrical context" did not amount to "expressive conduct such that First Amendment guarantees, and protections could be extended to it" and that the Theaters had not established that they had "a reasonable likelihood of success on the merits at trial."

## II. Smoking Bans

Over the past several decades, there has been increasing evidence of the dangers of cigarette smoking and second-hand smoke. *See generally NYC C.L.A.S.H., Inc. v. City of New York*, 315 F.Supp.2d 461, 476 (S.D.N.Y.2004)(discussion of research detailing the harmful effects of smoking and subsequent regulations). We recognize that the legislature created the Smoking Ban to

protect nonsmokers from involuntary exposure to environmental tobacco smoke in most indoor areas open to the public, public meetings, food service establishments, and places of employment. The general assembly further finds and determines that a balance should be struck between the health concerns of nonconsumers of tobacco products and the need to minimize unwarranted governmental intrusion into, and regulation of, private spheres of conduct and choice with respect to the use or nonuse of tobacco products in certain designated public areas and in private places. . . . [T]he purpose of this [Smoking Ban] . . . is to preserve and improve the health, comfort, and environment of the people of this state by limiting exposure to tobacco smoke.

§ 25–14–202, C.R.S.2007.

In the 1970s, states, such as Arizona and Minnesota, enacted the first state-wide smoking bans. *See* Jordan Raphael, *The Calabasas Smoking Ban: A Local Ordinance*

*Points the Way for the Future of Environmental Tobacco Smoke Regulation,* 80 S. Cal. L.Rev. 393, 399 (Jan.2007). As the anti-smoking movement advanced, local ordinances predominated. *Id.* at 400. Such statutes and ordinances typically prohibit smoking indoors, but they may also forbid smoking in a few specified outdoor areas. *See* Calabasas, Cal., Mun.Code §§ 8.12.010 to 8.12.080 (2007).

More recently, a large number of states have enacted statewide smoking bans, relying on their traditional police power to provide for the public health and safety as the authority to enact such legislation. *See In re Moyer,* 35 Colo. 159, 222, 85 P. 190, 211 (1904) (the legislature has a duty to protect the state's citizens).

The United States Supreme Court has recognized that the power to pass such laws

> extends ... to the protection of the lives, limbs, health, comfort, and quiet of all persons, and the protection of all property within the State; ... and persons and property are subject to all kinds of restraints and burdens in order to secure the general comfort, health, and prosperity of the State. Of the perfect right of the legislature to do this no question ever was, or, upon acknowledged general principles, ever can be made, so far as natural persons are concerned.

*Slaughter–House Cases,* 83 U.S. (16 Wall.) 36, 62, 21 L.Ed. 394 (1872) (quoting *Thorpe v. Rutland & Burlington R.R. Co.,* 27 Vt. 140, 149 (1854)); *see also Barnes v. Glen Theatre, Inc.,* 501 U.S. 560, 569, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991).

Smoking bans have been uniformly upheld against a variety of challenges to their validity. *See Elliott v. Bd. of Weld County Comm'rs,* 796 P.2d 71 (Colo.App.1990) (due process, equal protection); *see also City of Tucson v. Grezaffi,* 200 Ariz. 130, 23 P.3d 675 (Ariz.Ct.App.2001)(Fifth Amendment taking, prohibition on special legislation, freedom of association, equal protection, government's ability to regulate health matters); *Lexington Fayette County Food & Beverage Ass'n v. Lexington–Fayette Urban County Gov't,* 131 S.W.3d 745 (Ky.2004)(impermissible government interference with business, vague-

ness); *Traditions Tavern v. City of Columbus,* 171 Ohio App.3d 383, 870 N.E.2d 1197 (2006)(vagueness, substantive due process, equal protection); *see also Thiel v. Nelson,* 422 F.Supp.2d 1024, 1029–30 (W.D.Wis. 2006)(due process, equal protection challenges to smoking ban in prisons)(collecting cases).

Currently, more than half the states and the District of Columbia have some form of smoking ban. *See* Ariz.Rev.Stat. § 36–601.01 (2007); Cal. Lab.Code § 6404.5 (2007); §§ 25–14–201 to–209, C.R.S.2007; Conn. Gen.Stat. § 19a–342 (2007); Del.Code Ann. tit. 16, §§ 2901 to 2908 (2007); D.C.Code §§ 7–1701 to –1710 (2007); Fla. Stat. §§ 386.201 to .2125 (2007); Haw.Rev.Stat. §§ 328J–1 to –17 (2007); Idaho Code Ann. §§ 39–5501 to –5511 (2007); 410 Ill. Comp. Stat. 82/1 to /75 (2007); La.Rev.Stat. Ann. §§ 40:1300.251 to .263 (2007); Me.Rev.Stat. Ann. tit. 22, §§ 1541 to 1548 (2007); Md.Code Ann., Health–Gen. §§ 24–501 to –511 (2007); Mass. Gen. Laws ch. 270, § 22 (2007); Minn. Stat. § 144.414 (2007); Mont.Code Ann. §§ 50–40–101 to –115 (2007); Nev.Rev.Stat. §§ 202.2485 to .2492 (2007); N.H.Rev.Stat. Ann. §§ 155:64 to :77 (2007); N.J. Stat. Ann. §§ 26:3D–55 to –64 (2007); N.M. Stat. §§ 24–16–1 to –4 (as amended by H.B. 283, effective June 15, 2007); N.Y. Pub. Health Law § 1399–n to -x (2007); N.D. Cent.Code §§ 23–12–09 to –11 (2007); Ohio Rev.Code Ann. §§ 3794.01 to .09 (2007); Or.Rev.Stat. §§ 433.835 to .875 (2007); R.I. Gen. Laws § 23–20.10–1 to –16 (2007); S.D. Codified Laws § 22–36–2 (2007); Utah Code Ann. §§ 26–38–1 to –9 (2007); Vt. Stat. Ann. tit. 18, §§ 1741 to 1746 (2007); Wash. Rev.Code §§ 70.160.010 to .100 (2007).

Smoking bans are not exclusive to the United States, but are becoming more prevalent throughout the world. *See* Jessica Niezgoda, Note, *Kicking Ash(trays): Smoking Bans in Public Workplaces, Bars, and Restaurants Current Laws, Constitutional Challenges, and Proposed Federal Regulation,* 33 J. Legis. 99, 100–01 (2006); Eric A. Feldman, *The Culture of Legal Change: A Case Study of Tobacco Control in Twenty–First Century Japan,* 27 Mich. J. Int'l L. 743, 784–86 (2006).

Nevertheless, some jurisdictions have included exceptions for theatrical performances. *See* Ariz.Rev.Stat. § 36–601.01(B)(7) (2007) (ban not applicable to "[a] theatrical performance upon a stage or in the course of a film or television production if the smoking is part of the performance or production"); Cal. Lab.Code § 6404.5(d)(9) (2007) (ban does not apply to "[t]heatrical production sites, if smoking is an integral part of the story in the theatrical production"); D.C.Code § 7–1708(3) (2007) (does not prohibit smoking "[u]pon the stage by performers during the course of any theatrical performance if smoking is part of the theatrical production"); Idaho Code Ann. § 39–5503(1)(e) (2007) (ban does not apply to "[t]heatrical production sites, if smoking is an integral part of the story in the theatrical production"); Me.Rev.Stat. Ann. tit. 22, § 1542(2)(B) (2007) ("Smoking is not prohibited in theaters . . . if the smoking is solely by a performer and the smoking is part of the performance."); Mass. Gen. Laws ch. 270, § 22(c)(6) (2007) (theatrical performer may smoke during a performance if permission first granted by appropriate local authorities); Minn.Stat. § 144.4167(9) (2007) (smoking permitted "as part of a theatrical performance" as long as advance notice of smoking is given to theater patrons); N.M. Stat. § 24–16–4(N) (as amended by H.B. 283)(smoking is permitted on a "theatrical stage . . . when it is necessary for performers to smoke as part of the production"); R.I. Gen. Laws § 23–20.10–6(b) (2007)("this chapter shall not apply to any stage performance provided that smoking is part of a theatrical production"); N.Y.C. Admin. Code § 17–503(a)(8) (2007) ("except that smoking may be part of a theatrical production"); *cf.* Haw.Rev.Stat. § 328J–7(6) (2007)(exception only covers areas where "smoking is part of a production being filmed"). At least one state's smoking ban does not encompass theaters by definition. Nev.Rev.Stat. § 202.2491 (2007). Some jurisdictions grant exemptions on a case-by-case basis. N.Y. Pub. Health Law § 1399–u (2007).

The Colorado legislature, along with those of nineteen other states, has rejected a proposed amendment that would have created an exception to the Smoking Ban for theatrical productions. Second Reading of H.B. 1175, 65th Gen. Assemb., 2d Sess. (floor debate on Amendment L.030, Feb. 10, 2006). The legislature included other exceptions, such as an airport smoking area. § 25–14–205(1)(f), C.R.S.2007. Enforcement of the Smoking Ban is assigned to the Health Department. § 25–1–109(1)(a), C.R.S.2007.

### III. Standard of Review

■ The purpose of a preliminary injunction is to protect against irreparable injury and to maintain a trial court's ability to render a "meaningful decision" after a trial on the merits. *Bloom v. Nat'l Collegiate Athletic Ass'n*, 93 P.3d 621, 623 (Colo.App. 2004). Requests for preliminary injunctions to prevent the enforcement of criminal statutes are "extraordinary," and are "not justified except in the most exceptional circumstances." *Rathke v. MacFarlane*, 648 P.2d 648, 653 (Colo.1982). The party seeking to enjoin the enforcement of a criminal law must, as a threshold matter, make a "clear showing that injunctive relief is necessary to protect existing legitimate property rights or fundamental constitutional rights." *Id.*

■ Generally, statutes passed to protect the public's health, safety, and welfare, are presumed to be reasonable. *U.S. Disposal Sys., Inc. v. City of Northglenn*, 193 Colo. 277, 281, 567 P.2d 365, 367 (1977); *Risen v. Cucharas Sanitation & Water Dist.*, 32 P.3d 596, 601 (Colo.App.2001). However, in certain situations involving First Amendment rights, statutes are presumed to be unconstitutional, and the burden is upon the government to establish the statute's constitutionality. *See People ex rel. Tooley v. Seven Thirty–Five E. Colfax, Inc.*, 697 P.2d 348, 370 (Colo.1985)(system of prior restraint).

Here, the Theaters only argue that the Smoking Ban is unconstitutional as applied to them, and that it should only be invalidated in future similar applications. *See generally People v. Shepard*, 983 P.2d 1, 3 n. 1 (Colo. 1999). Thus, they bear the initial burden of making a threshold showing that the Smoking Ban adversely affects their fundamental constitutional rights under the First Amend-

ment and Colorado Constitution article II, section 10.

The Theaters must, therefore, show that smoking in a play is expressive conduct protected by the First Amendment, and that the Smoking Ban incidentally affects this expressive conduct. *See Texas v. Johnson*, 491 U.S. 397, 403, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989) (as-applied challenge); *Denver Publ'g Co. v. City of Aurora*, 896 P.2d 306, 318–19 (Colo.1995). The Theaters must "advance more than a mere 'plausible contention' that [their] conduct is expressive." *Church of Am. Knights of Ku Klux Klan v. Kerik*, 356 F.3d 197, 205 (2d Cir.2004) (citing *Clark v. Cmty. for Creative Non–Violence*, 468 U.S. 288, 293 n. 5, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984)).

■ As the Supreme Court explained in *Clark*, 468 U.S. at 293 n. 5, 104 S.Ct. 3065:

> Although it is common to place the burden upon the Government to justify impingements on First Amendment interests, it is the obligation of the person desiring to engage in assertedly expressive conduct to demonstrate that the First Amendment even applies. To hold otherwise would be to create a rule that all conduct is presumptively expressive. In the absence of a showing that such a rule is necessary to protect vital First Amendment interests, we decline to deviate from the general rule that one seeking relief bears the burden of demonstrating that he is entitled to it.

■ Whether the Theaters have made such a threshold showing here is a question of law we review de novo. *Lewis v. Colo. Rockies Baseball Club, Ltd.*, 941 P.2d 266, 271 (Colo.1997); *Holliday v. Reg'l Transp. Dist.*, 43 P.3d 676, 681 (Colo.App.2001).

If the Theaters establish that smoking in a play is expressive conduct, the burden then shifts to the state to show that the Smoking Ban "furthers a sufficiently important governmental interest" under *7250 Corp. v. Bd. of County Comm'rs*, 799 P.2d 917, 924 (Colo. 1990), which adopted the four-factor test set forth in *United States v. O'Brien*, 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) (as-applied challenge). *See Essence, Inc. v. City of Federal Heights*, 285 F.3d 1272, 1283–84 (10th Cir.2002); *Denver Publ'g Co.*, 896 P.2d at 319.

■ Courts normally employ two forms of scrutiny when evaluating whether statutes or ordinances violate the First Amendment. Courts subject statutes and ordinances that "suppress, disadvantage, or impose differential burdens upon speech because of its content" to the exacting standard of strict scrutiny to determine their constitutionality. *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 642, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994). To survive this level of scrutiny, the government must show that the law is "supported by a compelling governmental interest and is narrowly drawn to achieve that interest by the least restrictive means possible." *Sanger v. Dennis*, 148 P.3d 404, 415 (Colo.App.2006).

■ Content-neutral statutes or ordinances are subject to an intermediate level of scrutiny, "because in most cases they pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue." *Turner Broad.*, 512 U.S. at 642, 114 S.Ct. 2445; *see Ward v. Rock Against Racism*, 491 U.S. 781, 798 n. 6, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989); *Johnson*, 491 U.S. at 403, 109 S.Ct. 2533 ("If the State's regulation [of expressive conduct] is not related to expression, then the less stringent standard we announced in *United States v. O'Brien* for regulations of noncommunicative conduct controls."); *Porter v. Bowen*, 496 F.3d 1009, 1021 (9th Cir.2007).

Thus, we must decide the following issues:

● Whether the Theaters have established that smoking by an actor in the course of a theatrical performance is expressive conduct for the purposes of the First Amendment, and, if so, whether this expressive conduct is incidentally burdened by the Smoking Ban?

● If so, whether the Smoking Ban is content neutral and its constitutionality under the First Amendment is therefore evaluated under the intermediate scrutiny of the four-part *O'Brien* test, as opposed to the more exacting strict scrutiny test?

- If so, whether the Smoking Ban is constitutional for purposes of the First Amendment under the *O'Brien* test?
- If so, because the Colorado Constitution provides greater protection of speech than the First Amendment in certain situations, does the Smoking Ban nevertheless violate Colorado Constitution article II, section 10 as applied to these circumstances?

## IV. Analysis

The First Amendment of the United States Constitution provides that "Congress shall make no law ... abridging the freedom of speech."

Article II, section 10 of the Colorado Constitution states:

No law shall be passed impairing the freedom of speech; every person shall be free to speak, write or publish whatever he will on any subject, being responsible for all abuse of that liberty; and in all suits and prosecutions for libel the truth thereof may be given in evidence, and the jury, under the direction of the court, shall determine the law and the fact.

### A. First Amendment

#### 1. General Protections of Theatrical Performances

■ We conclude that the Theaters established that smoking by an actor as part of a theatrical production is expressive conduct for purposes of the First Amendment.

Plays and theatrical productions receive substantial and necessary constitutional protection because of their important communicative content.

Long before the advent of printing and motion pictures the theater constituted "a significant medium for the communication of ideas" which affected "public attitudes and behavior in a variety of ways, ranging from direct espousal of a political or social doctrine to the subtle shaping of thought which characterizes all artistic expression."

*Barrows v. Mun. Court,* 1 Cal.3d 821, 824, 83 Cal.Rptr. 819, 464 P.2d 483, 485 (1970) (quot-

ing *Joseph Burstyn, Inc. v. Wilson,* 343 U.S. 495, 501, 72 S.Ct. 777, 96 L.Ed. 1098 (1952)).

■ "[T]he Constitution protects the right to receive information and ideas." *Stanley v. Georgia,* 394 U.S. 557, 564, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969).

A municipal theater is no less a forum for the expression of ideas than is a public park, or a sidewalk; the forms of expression adopted in such a forum may be more expensive and more structured than those typically seen in our parks and streets, but they are surely no less entitled to the shelter of the First Amendment.

*Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 563, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975) (Douglas, J., concurring) (*Conrad*).

The nonverbal elements in a theatrical production are the very ones which distinguish this form of art from literature. It may be true that First Amendment protections vary in different media, but a musical play must be deemed a unitary form of constitutionally protected expression.

*Southeastern Promotions, Ltd. v. City of Atlanta,* 334 F.Supp. 634, 639 (N.D.Ga.1971).

■ "Each medium of expression ... must be assessed for First Amendment purposes by standards suited to it, for each may present its own problems." *Conrad,* 420 U.S. at 557, 95 S.Ct. 1239 (majority opinion). Theaters are "public forums designed for and dedicated to expressive activities." *Id.* at 555, 95 S.Ct. 1239. "By its nature, theater usually is the acting out—or singing out—of the written word, and frequently mixes speech with live action or conduct." *Id.* at 557–58, 95 S.Ct. 1239. However, the Supreme Court has rejected "the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." *O'Brien,* 391 U.S. at 376, 88 S.Ct. 1673.

#### 2. Expressive Conduct in Theatrical Performances

■ Conduct can be "sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments." *Johnson,* 491 U.S. at 404,

109 S.Ct. 2533 (quoting *Spence v. Washington*, 418 U.S. 405, 409, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974)); *see also O'Brien*, 391 U.S. at 376, 88 S.Ct. 1673. To determine if conduct is expressive, we look to whether (1) "[a]n intent to convey a particularized message was present" and (2) "the likelihood was great that the message would be understood by those who viewed it." *Johnson*, 491 U.S. at 404, 109 S.Ct. 2533 (quoting *Spence*, 418 U.S. at 410–11, 94 S.Ct. 2727). Hence, we analyze the conduct from the perspective of both the actor and the viewer.

■ "The *[Johnson]* threshold [for the first prong of the test] is not a difficult one, as 'a narrow, succinctly articulable message is not a condition of constitutional protection.'" *Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 388 (6th Cir.2005)(quoting *Hurley v. Irish–American Gay, Lesbian & Bisexual Group*, 515 U.S. 557, 569, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995))(concluding a school dress code did not violate the First Amendment under *Johnson*).

■ To satisfy the second prong, the likelihood must be great that at least *some* of those who viewed the conduct understood there was *some* message, even where a number of viewers did not comprehend its intended point. *Egolf v. Witmer*, 421 F.Supp.2d 858, 868 (E.D.Pa.2006).

The Supreme Court has found many instances where conduct falls under First Amendment protections. *E.g., Hurley*, 515 U.S. 557, 115 S.Ct. 2338 (marching in a parade); *United States v. Eichman*, 496 U.S. 310, 110 S.Ct. 2404, 110 L.Ed.2d 287 (1990) (burning the flag of the United States); *Cohen v. California*, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971) (wearing a jacket displaying vulgar language in protest of war); *Stanley*, 394 U.S. 557, 89 S.Ct. 1243 (obtaining or possessing obscene materials in one's home); *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) (wearing an armband in protest of war); *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943) (saluting the flag or not saluting the flag). These cases provide guidance as to what constitutes expressive conduct and the protections it is afforded.

■ Smoking, by itself, is not sufficiently expressive to qualify for First Amendment protection. *See Rohde v. City of Austin*, 124 Fed.Appx. 246 (5th Cir.2005)(unpublished per curiam); *NYC C.L.A.S.H.*, 315 F.Supp.2d at 476; *Taverns for Tots, Inc. v. City of Toledo*, 341 F.Supp.2d 844, 853 (N.D.Ohio 2004). Nevertheless, we are not persuaded by the Health Department's reliance on *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 704–05, 106 S.Ct. 3172, 92 L.Ed.2d 568 (1986), for the proposition that smoking in the course of a play cannot be expressive conduct. The activity in *Arcara* was prostitution and open sexual conduct. It was not communicative, even from the perspective of the person prosecuted.

Contrary to the Health Department's contention, smoking may be used to give insight into a character's personality, set the mood, or evoke an era. A play might use smoking to communicate specific plot twists, such as a character being diagnosed with cancer after a lifetime of smoking. Smoking could be used to make political statements about smoking itself. *E.g.,* David Cornue, Sam Holtzapple, Warren Loy, & Chris Todd, *Smoking Bloomberg* (2006) (Broadway play).

The Theaters list a number of plays that require smoking as critical elements of their performance, including such classics as Edward Albee's *Who's Afraid of Virginia Woolf?*, Jez Butterworth's *Mojo*, John Osborne's *Look Back in Anger*, Julianne Shepherd's *Buicks*, John Patrick Shanley's *Sailor Song*, Tennessee Williams's *Vieux Carre*, Eugene O'Neill's *A Moon for the Misbegotten*, Harold Pinter's *The Caretaker*, John Pielmeier's *Agnes of God*, Nilo Cruz's *Anna in the Tropics*, and Calder Willingham's *The Graduate*. The Theaters also note the insistence of certain playwrights that their plays be performed exactly as written, and contend the Smoking Ban will preclude them from presenting these plays in Colorado's indoor theaters.

The Theaters maintain that smoking is critical to the plot of their current work, *tempOdyssey*, because the plot entails a character who initially smokes during his life, and later realizes he has died because he can no

longer smoke. His inability to inhale or exhale is demonstrated through the act of smoking, and his failed attempts to smoke express a "fundamental, dramatic plot point."

Moreover, the Constitution does not require that the exact intended message be conveyed to every viewer. *Egolf,* 421 F.Supp.2d at 868. In fact, it is only required that some viewers understand that some message is being conveyed, and they need not agree on the interpretation of the message. *Holloman v. Harland,* 370 F.3d 1252, 1270 (11th Cir.2004); *see Hurley,* 515 U.S. at 569, 115 S.Ct. 2338 (requiring expressions to convey a "particularized message" to each viewer would prevent the "painting of Jackson Pollock, music of Arnold Schöenberg, or Jabberwocky verse of Lewis Carroll" from First Amendment protections); *White v. City of Sparks,* 500 F.3d 953, 956 (9th Cir.2007) (artistic expression accomplishes its aims by "spurring thoughtful reflection in and discussion among its viewers").

We conclude that the Theaters met their initial burden by showing that (1) the act of smoking on stage in the course of a play is expressive conduct, allowing the Theaters to invoke the protections of the First Amendment; and (2) the Smoking Ban places an incidental burden on this expressive conduct by prohibiting it. We must, therefore, next determine whether the Smoking Ban is content based and subject to strict scrutiny, or content neutral and subject to intermediate scrutiny under *O'Brien.*

### 3. Level of Scrutiny

To determine whether a statute is content neutral, we focus on the legislature's purpose for enacting it. *Ward,* 491 U.S. at 791, 109 S.Ct. 2746. If the statute "serves purposes unrelated to the content of expression [it] is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Id.*

We conclude the Smoking Ban is content neutral because it focuses on the adverse health effects of tobacco smoke, not on expression. It does not address ideas or communication, and does not attempt to regulate speech. There is no indication it was designed to suppress any subject matter, opinion, or concept. It does not express disagreement with any particular message, theatrical or otherwise. *See Hill v. Colorado,* 530 U.S. 703, 719, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000); *Am. Life League, Inc. v. Reno,* 47 F.3d 642, 649 (4th Cir.1995). The Smoking Ban was not intended to prevent actors from expressing emotion, setting a mood, illustrating a character trait, emphasizing a plot twist, or making a political statement. Instead, the Smoking Ban prohibits certain conduct because of its harmful health effects. *See Am. Life League,* 47 F.3d at 652.

Accordingly, we apply the intermediate level of scrutiny prescribed by *O'Brien.* Under that test, we ask whether (1) the statute is within the constitutional power of the government; (2) it furthers an important or substantial governmental interest; (3) the government's interest in establishing the regulation is unrelated to the suppression of free expression; and (4) the incidental restriction is no greater than is necessary to further that interest. *O'Brien,* 391 U.S. at 381, 88 S.Ct. 1673 (finding the nation's "vital interest in having a system for raising armies that functions with maximum efficiency and is capable of easily and quickly responding to continually changing circumstances" sufficiently justified prohibiting the burning of selective service cards).

We conclude all four of the *O'Brien* factors were satisfied in this case. *See Denver Publ'g Co.,* 896 P.2d at 319 n. 20 (burden of proof is not quantified as preponderance of the evidence or as beyond a reasonable doubt; rather, government must show that "the legislation complies with constitutional requirements").

#### a. Government's Constitutional Power

The first *O'Brien* factor is satisfied because Colorado's legislature has the authority to enact statutes designed to promote the public health. Colo. Const. art. V, § 1(4) (the General Assembly has the power to "enact any measure"). The government, through its police power, may promulgate ordinances to promote the health, safety, morals, and general welfare of its citizens.

*Hill,* 530 U.S. at 715, 120 S.Ct. 2480; *City of Erie v. Pap's A.M.,* 529 U.S. 277, 296, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000); *Slaughter–House Cases,* 83 U.S. at 62; *7250 Corp.,* 799 P.2d at 917 (zoning of nude entertainment establishments); *Eachus v. People,* 124 Colo. 454, 468, 238 P.2d 885, 892 (1951).

### b. Important Governmental Interest

The General Assembly declared the purpose of the Smoking Ban to be "to preserve and improve the health, comfort, and environment of the people of this state by limiting exposure to tobacco smoke." § 25–14–202. Thus, the Smoking Ban serves an important governmental interest by protecting the health of Colorado's citizens. *Barnes,* 501 U.S. at 582, 111 S.Ct. 2456; *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 48, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986) (government's interest in preserving quality of life must be granted high respect); *see Hill v. Thomas,* 973 P.2d 1246, 1258 (Colo. 1999)("it has long been acknowledged that government 'may properly assert important interests in safeguarding health'" (quoting *Roe v. Wade,* 410 U.S. 113, 150, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973))), *aff'd,* 530 U.S. 703, 120 S.Ct. 2480, 147 L.Ed.2d 597.

The dangers and health care costs attributed to smoking and its effects are well documented. *See generally NYC C.L.A.S.H.,* 315 F.Supp.2d at 487. We defer to the legislature's determination that the Smoking Ban is needed, because the General Assembly "is far better equipped than the judiciary to 'amass and evaluate the vast amounts of data' bearing upon an issue as complex and dynamic as that presented here." *See Turner Broad.,* 512 U.S. at 665–66, 114 S.Ct. 2445 (quoting *Walters v. Nat'l Ass'n of Radiation Survivors,* 473 U.S. 305, 331 n. 12, 105 S.Ct. 3180, 87 L.Ed.2d 220 (1985)).

### c. Interest Unrelated to Free Expression

We have already concluded that the Smoking Ban is content neutral, because it is justified by health concerns unrelated to expression. Hence, the third *O'Brien* factor has been satisfied. *See Am. Life League,* 47 F.3d at 652; *7250 Corp.,* 799 P.2d at 925 (adult business zoning ordinance focused on preventing "adverse secondary effects" rather than the dissemination of "offensive" speech). The legislature has enacted a statute designed to regulate the adverse health effects of smoke on nonsmokers, and has written it in such as way as to accomplish that goal. *See 7250 Corp.,* 799 P.2d at 925.

With narrow exceptions not relevant here, the Smoking Ban is applied uniformly to indoor areas where members of the public may congregate, including public meeting places, courtrooms, hospitals, restaurants, restrooms, libraries, and theaters. § 25–14–204. It applies to everyone in these places.

### d. Scope of Incidental Restriction

The fourth prong of *O'Brien* requires that we investigate the breadth of the restriction. "[E]ven regulations aimed at proper governmental concerns can restrict unduly the exercise of rights protected by the First Amendment." *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.,* 502 U.S. 105, 117, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991) (quoting *Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue,* 460 U.S. 575, 592, 103 S.Ct. 1365, 75 L.Ed.2d 295 (1983)). Regulations on expressive conduct

> must be narrowly tailored to serve the government's legitimate, content-neutral interests but . . . it need not be the least restrictive or least intrusive means of doing so. Rather, the requirement of narrow tailoring is satisfied "so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation."

*Ward,* 491 U.S. at 798–99, 109 S.Ct. 2746 (footnote omitted)(quoting *United States v. Albertini,* 472 U.S. 675, 689, 105 S.Ct. 2897, 86 L.Ed.2d 536 (1985))(employing "time, place, or manner" test to evaluate restrictions on expression in a public forum); *see Barnes,* 501 U.S. at 566, 111 S.Ct. 2456 ("time, place, or manner" test and *O'Brien* test "embody much the same standards").

"Government may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Ward,* 491 U.S.

at 799, 109 S.Ct. 2746 (citing *Frisby v. Schultz*, 487 U.S. 474, 485, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988)).

> So long as the means chosen are not substantially broader than necessary to achieve the government's interest … the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative. "The validity of [time, place, or manner] regulations does not turn on a judge's agreement with the responsible decision-maker concerning the most appropriate method for promoting significant government interests" or the degree to which those interests should be promoted.

*Ward*, 491 U.S. at 800, 109 S.Ct. 2746 (quoting *Albertini*, 472 U.S. at 689, 105 S.Ct. 2897). The requirement that the means be narrowly tailored is aided where a statute leaves open "ample alternative channels for communication of the information." *Clark*, 468 U.S. at 293, 104 S.Ct. 3065; *see also Denver Publ'g Co.*, 896 P.2d at 313–16.

■ We conclude the Smoking Ban is narrowly tailored, because it focuses directly on the one form of conduct, smoking, upon which the state's announced interest in protecting public health depends. *See State v. Ball*, 260 Conn. 275, 294, 796 A.2d 542, 554 (2002) (statute banning interference with hunters narrowly tailored because it only furthered the government interest prompting the ban, "the actual taking of wildlife").

Further, the Smoking Ban allows other channels of expression, such as outdoor theatrical performances. *See Gun Owners' Action League, Inc. v. Swift*, 284 F.3d 198, 212 (1st Cir.2002) (restriction on shooting at targets depicting human figures at one class of gun clubs allowed ample alternatives because shooters could lawfully fire at targets at other places).

There are alternative channels for expression within indoor theaters. The communication of mood, emotion, attitude, and expression can take various forms. Concepts can be conveyed in different ways, and by different conduct.

Contrary to the Theaters' arguments, reasonable alternatives to smoking real cigarettes and pipes are available. Theater audiences exercise what Samuel Taylor Coleridge called a "willing suspension of disbelief for the moment." Samuel Taylor Coleridge, *Biographia Literaria, in Selected Critical Essays* 28, 29 (T. Raysor ed., 1958). By doing so, the members of the audience allow themselves to experience the play's emotions and messages as if they were real.

But the audience is aware that the scenes are not real. Murders are not committed, actors do not fire live bullets at each other or at the audience, the theater is not set afire to illustrate the burning of Rome in *Julius Caesar*, an actor in a play about the effects of heroin does not inject the drug, and an actor depicting suicide does not hook a hose to the tailpipe of a running automobile on stage. Rather, these activities are simulated, because, although the First Amendment protects the actor's right to express the ideas of murder, arson, drug use, and suicide, actually murdering, setting conflagrations, ingesting controlled substances, or flooding the theater with carbon monoxide would be illegal and dangerous conduct.

The trial court concluded there were reasonable alternatives to smoking, such as fake and prop cigarettes, that can, and are, being used by theaters in jurisdictions with smoking bans. Although the Theaters view these substitutes as inadequate, they did not demonstrate that the use of substitutes is so inadequate as to outweigh the state's strong interest in protecting the health of its citizens. *See Clark*, 468 U.S. at 293, 104 S.Ct. 3065; *Denver Publ'g Co.*, 896 P.2d at 316–18.

The Theaters suggest ways to avoid exposing nonsmokers to involuntary exposure to indoor tobacco smoke, such as providing prior notice to the public that actors will smoke during the production, or by employing ventilation systems. However, the existence of such alternatives does not compel a different result. As the Supreme Court recognized in *Ward*, 491 U.S. at 800, 109 S.Ct. 2746, and *Albertini*, 472 U.S. at 689, 105 S.Ct. 2897, content-neutral regulations that incidentally burden speech are not invalid simply because

an alternative might be less burdensome on speech.

Here, we need not decide whether the legislature reached the best solution in enacting the Smoking Ban. That is not the court's role. We need only conclude that it was reasonable for the legislature to have determined that preventing involuntary exposure to tobacco smoke is achieved most effectively by banning all smoking in indoor locations, including theaters. *See Ward,* 491 U.S. at 801, 109 S.Ct. 2746; *Clark,* 468 U.S. at 297, 104 S.Ct. 3065 ("if the parks would be more exposed to harm without the ... prohibition than with it, the ban is safe from invalidation under the First Amendment"); *Denver Publ'g Co.,* 896 P.2d at 315–16.

We therefore conclude that, although the Smoking Ban is not the least restrictive means, it is narrowly tailored to achieve a legitimate state interest.

For these reasons, we conclude that the Smoking Ban, as applied to the Theaters, does not violate their First Amendment right to freedom of expression.

## B. The Colorado Constitution

The Smoking Ban, as applied to the Theaters, must also comport with our state constitution, and we conclude that it does. *Bock v. Westminster Mall Co.,* 819 P.2d 55, 59–60 (Colo.1991) (collecting cases); *Seven Thirty-Five E. Colfax, Inc.,* 697 P.2d at 356.

In a few instances, the supreme court has recognized the broader scope of the Colorado Constitution in the area of free expression. *E.g., Tattered Cover, Inc. v. City of Thornton,* 44 P.3d 1044, 1056 (Colo.2002) (concluding the Colorado Constitution required a more substantial justification from the government than is required by the Fourth Amendment for a search warrant seeking customer purchase records); *Bock,* 819 P.2d at 59–60 (expanding the scope of those private businesses required to permit free speech within their walls beyond those entities described by the United States Supreme Court); *People v. Ford,* 773 P.2d 1059, 1066 (Colo.1989) (establishing the "tolerance standard" as the proper way to measure which obscene materials are protected by the Colo-

rado Constitution); *Marco Lounge, Inc. v. City of Federal Heights,* 625 P.2d 982, 985 (Colo.1981)(finding nude dancing constitutes protected expression in Colorado).

However, none of these cases involved a state interest connected with public health, particularly a health concern so damaging and well known. Further, the supreme court has recognized that speech protections may sometimes yield to greater policy interests. *Pierce v. St. Vrain Valley Sch. Dist. RE–1J,* 981 P.2d 600, 606 n. 8 (Colo.1999).

We therefore decline to interpret Colorado Constitution article II, section 10 more expansively than the First Amendment in this context. *See CF & I Steel, L.P. v. United Steel Workers,* 23 P.3d 1197, 1200 (Colo.2001)(residential picketing arising from labor disputes); *Pierce v. St. Vrain Valley Sch. Dist.,* 981 P.2d at 606 (confidentiality provisions of a settlement agreement); *Colo. Rockies Baseball,* 941 P.2d at 271–72, n. 8 (sidewalks as a public forum); *Lorenz v. State,* 928 P.2d 1274, 1285, n. 17 (Colo.1996) (ballot access and right to hold public office; rules of standing); *Denver Publ'g Co.,* 896 P.2d at 311 (solicitation of occupants in vehicles to buy newspapers); *Parrish v. Lamm,* 758 P.2d 1356, 1365–66 (Colo.1988) (chiropractors' advertising policy to waive patient obligations to pay deductibles and copayments); *MacGuire v. Houston,* 717 P.2d 948, 954–55 (Colo.1986) (political affiliation prohibiting ability to serve as an election judge); *Pankratz v. Dist. Court,* 199 Colo. 411, 413–14, 609 P.2d 1101, 1102–03 (1980) (requirement that members of the media comply with subpoenas).

## V. Conclusion

The party seeking a preliminary injunction must demonstrate (1) the party has a reasonable probability of success on the merits; a danger of real, immediate, and irreparable injury exists that injunctive relief would prevent; (3) the party lacks a plain, speedy, and adequate remedy at law; (4) granting the preliminary injunction would not disserve the public interest; (5) the balance of equities favors granting the injunction; and (6) the injunction will preserve the status quo until a

trial upon the merits occurs. C.R.C.P. 65(a); *Rathke,* 648 P.2d at 653–54.

Given our conclusion that the Smoking Ban is a content-neutral statute and is constitutional under the intermediate scrutiny standard established by *O'Brien* as applied to the Theaters, we conclude the trial court did not abuse its discretion in determining that the Theaters did not show they had a reasonable probability of success on the merits. Accordingly, they were not entitled to a preliminary injunction.

The judgment denying the Theaters' request for a preliminary injunction and declaratory relief is affirmed.

Judge ROTHENBERG and Judge CARPARELLI concur.