2014 COA 95

**The PEOPLE of the State of Colorado, Plaintiff–Appellee,**

v.

**Bruce Joseph NOZOLINO, Defendant–Appellant.**

**Court of Appeals No. 12CA2308**

Colorado Court of Appeals, Div. IV.

Announced July 31, 2014

John W. Suthers, Attorney General, Majid Yahzdi, Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee

Barker & Tolini, P.C., Joshua Tolini, Colorado Springs, Colorado, for Defendant–Appellant

Opinion by JUDGE DUNN

¶ 1 Defendant, Bruce Joseph Nozolino, appeals the judgment of conviction entered on jury verdicts finding him guilty of four counts of tampering with a witness. We reverse Nozolino's convictions for counts 4 and 5 (the counts related to his mother and brother). The judgment of conviction is otherwise affirmed.

## I. Background

¶ 2 In 2001, someone fired shots into the home of Nozolino's ex-wife's divorce attorney. Later that year, shots were fired into the home of the Honorable Gilbert Martinez of the Fourth Judicial District, who presided over portions of Nozolino's divorce case. In 2002, the divorce attorney was shot in the face. And in 2008, a man who allegedly had an affair with Nozolino's ex-wife was fatally shot outside his home.

¶ 3 A statutory grand jury convened to investigate the shootings. The Honorable Kirk S. Samelson, then the Chief Judge of the Fourth Judicial District, presided over the grand jury. While the grand jury was

convened, Nozolino gave two friends, Wade Feller and Albert Shrecengost, the following pre-printed statement:

> When forced into any kind of court appearance by subpoena, you have a constitutional right to not answer any (or all) questions posed to you. After giving your name and address, then politely, courteously, and respectfully state that you wish to exert your constitutional rights to remain silent and not incriminate yourself by not answering the question. You may say this after every question and may also state ahead of time that this will be your answer to all questions. You may also give this answer if you are asked if you were coached by anyone on how to respond. You also have a right to ask for a lawyer at any point in time. This right to a lawyer is absolute and the court can not overrule this request.

¶ 4 Nozolino also told another friend, Brad Collins, to notify him using a code phrase if law enforcement officials contacted Collins. And after learning that detectives with the Colorado Springs Police Department were interviewing his family members, Nozolino emailed his mother, telling her that "cooperation isn't recommended with the cops!" He similarly advised his brother via e-mail that if the brother received a visit from the police, "then I recommend not talking to them. Enough said?"

¶ 5 Based upon these communications, the grand jury indicted Nozolino on five counts of witness tampering. A separate indictment was returned related to the shootings.

¶ 6 At a jury trial on the witness tampering charges, the district court granted Nozolino's motion for judgment of acquittal on the count involving Collins. The jury found Nozolino guilty of the remaining four witness tampering counts. The court sentenced Nozolino to consecutive terms in the custody of Department of Corrections, totaling sixteen years.

## II. Sufficiency of the Evidence

¶ 7 Nozolino contends that there was insufficient evidence to support his convictions for counts 4 and 5, the witness tampering counts

related to his mother and brother. We agree.

¶ 8 We review de novo whether the evidence is both substantial and sufficient to sustain a conviction beyond a reasonable doubt. *Dempsey v. People,* 117 P.3d 800, 807 (Colo.2005). Evidence is sufficient when a rational trier of fact might accept the evidence, taken as a whole and in the light most favorable to the prosecution, as sufficient to support a finding of guilt beyond a reasonable doubt. *Mata–Medina v. People,* 71 P.3d 973, 983 (Colo.2003); *People v. Warner,* 251 P.3d 556, 564 (Colo.App.2010).

¶ 9 As relevant here, a person commits tampering with a witness if, without bribery or threats, he intentionally attempts to induce a witness or a person he believes is to be called to testify as a witness in any official proceeding to unlawfully withhold any testimony. § 18–8–707(1)(a), C.R.S.2013.

¶ 10 The prosecution is neither required to present evidence that a witness has been legally summoned to an official proceeding, nor that the witness actually testified. *People v. Cunefare,* 102 P.3d 302, 306 (Colo. 2004) (interpreting the terms "testimony" and "unlawfully withhold" to protect statements that may be offered in the future, not just those already sworn or received as evidence). Nonetheless, the prosecution must present evidence that the defendant attempted to induce a witness either to testify falsely or to unlawfully withhold testimony. *See id.* at 304–05; § 18–8–707(1)(a).

¶ 11 Evidence was presented that while the grand jury was convened, El Paso County police officers interviewed Nozolino's mother and brother. Nozolino's mother informed her son about the police visit via e-mail. Nozolino responded, stating that she had confirmed his suspicion that he was the target of a grand jury investigation and recommending that she not cooperate with the police. Nozolino then sent a similar e-mail to his brother, recommending that the brother not talk to the police.

¶ 12 Standing alone, the e-mails neither advise nor advocate unlawful withholding of testimony. Indeed, an individual may lawfully refuse to speak with the police, and

it is not unlawful for a citizen to withhold cooperation during a consensual encounter with law enforcement. *See People v. Martinez*, 200 P.3d 1053, 1057 (Colo.2009) (during a consensual encounter with a police officer, an individual is free to leave or disregard the officer's request for information); *People v. Ray*, 252 P.3d 1042, 1048 (Colo.2011) (prospective witnesses may decline to submit to a pre-trial interview with either the prosecution or the defense); *see also United States v. Drayton*, 536 U.S. 194, 201, 122 S.Ct. 2105, 153 L.Ed.2d 242 (2002) (although law enforcement officers may pose questions even when they have no basis for suspecting a particular individual, the individual may freely terminate the encounter, if not seized); *accord Florida v. Royer*, 460 U.S. 491, 497–98, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983).

¶ 13 At trial, no additional evidence was presented indicating that Nozolino did anything other than suggest that his mother and brother not cooperate or speak with the police. No evidence was presented that Nozolino told them either not to cooperate with a lawful subpoena or not to testify before the grand jury or at trial. And the People do not argue that voluntary cooperation with law enforcement is legally required, or that an individual is legally required to speak with police. Based on the evidence presented, we conclude that the prosecution did not meet its burden to prove that Nozolino attempted to induce his family members to unlawfully withhold testimony.

¶ 14 Nor does *Cunefare*, upon which the People rely, change our analysis. In *Cunefare*, the defendant contacted the victim and convinced her to sign a letter recanting her truthful statements. 102 P.3d at 307. From this evidence, the supreme court concluded that it was reasonable to infer that the defendant intended to induce the victim to falsely claim that the events in question did not happen if the matter went to trial. *Id. Cunefare* thus did not address statements that, facially, advocated lawful activity.

¶ 15 True, the police officers who interviewed Nozolino's mother and brother did so as part of the grand jury's investigation.

But there is no evidence tethering the lawful suggestions in the e-mails to some action by Nozolino to induce his mother and brother to unlawfully withhold testimony or testify falsely. Thus, we conclude the evidence was not sufficient to satisfy the elements of witness tampering. § 18–8–707(1)(a); *see State v. Bailey*, 346 Or. 551, 213 P.3d 1240, 1248 n.6 (2009) (noting that it would be inappropriate to draw an inference that a defendant committed witness tampering from evidence of an inducement to do something lawful); *see also People v. Sprouse*, 983 P.2d 771, 778 (Colo.1999) (verdicts in criminal cases may not be based on guessing, speculation, or conjecture).

¶ 16 Accordingly, we vacate Nozolino's convictions for witness tampering with respect to counts 4 and 5, involving his mother and brother.

### III.   First Amendment Claim

¶ 17 Nozolino next contends that the witness tampering statute infringes on his right to free speech, and thus is unconstitutional as applied to his remaining two convictions.[1] We disagree.

### A.   Preservation

¶ 18 The People initially urge us not to address Nozolino's constitutional challenge, asserting that it was not properly preserved. Although Nozolino does not reference preservation in his opening brief, Nozolino moved to dismiss the witness tampering indictment "based on [the] First Amendment." Without objection, the district court found that the motion asserted an as-applied challenge to the constitutionality of the witness tampering statute. Accordingly, Nozolino preserved his as-applied constitutional challenge to section 18–8–707(1).

### B.   As–Applied Challenges and the First Amendment

¶ 19 A statute is presumed to be constitutional. *Curious Theater Co. v. Colo. Dep't of Pub. Health & Env't*, 216 P.3d 71,

---

1. Having vacated Nozolino's convictions on counts 4 and 5, we need not reach his First Amendment argument regarding these two convictions.

76–77 (Colo.App.2008), *aff'd,* 220 P.3d 544 (Colo.2009). Thus, the party attacking the constitutionality of a statute has the burden of proving the statute is unconstitutional, as applied, beyond a reasonable doubt. *People v. Gutierrez,* 622 P.2d 547, 555 (Colo.1981). An as-applied challenge alleges that a statute is unconstitutional as to the specific circumstances under which a defendant acted. *People v. Ford,* 232 P.3d 260, 263 (Colo.App. 2009). Whether a defendant has made a threshold showing that the First Amendment applies to his conduct is a question of law that we review de novo. *Curious Theater Co.,* 216 P.3d at 77.

¶ 20 The First Amendment, applicable to the states through the Fourteenth Amendment, provides that "Congress shall make no law ... abridging the freedom of speech." U.S. Const. amend. I; *see Tattered Cover, Inc. v. City of Thornton,* 44 P.3d 1044, 1051 (Colo.2002). The protections afforded by the First Amendment, however, are not absolute. To that end, the state may regulate certain categories of expression consistent with the Constitution. *See, e.g., Chaplinsky v. New Hampshire,* 315 U.S. 568, 571–72, 62 S.Ct. 766, 86 L.Ed. 1031 (1942).

¶ 21 Colorado's witness tampering statute was enacted to address possible interference with and barriers to the administration of justice. In particular, the purpose of the statute is to criminalize conduct that threatens the veracity and cooperation of witnesses to an official proceeding or otherwise subverts the administration of justice. *People v. Yascavage,* 101 P.3d 1090, 1092 (Colo.2004); *People v. Moyer,* 670 P.2d 785, 791 (Colo.1983). In light of these laudable goals, similar witness tampering statutes have survived overbreadth challenges and have been found facially constitutional. *See, e.g., Connecticut v. Bennett–Gibson,* 84 Conn. App. 48, 851 A.2d 1214, 1224 (2004) (Connecticut witness tampering statute not facially overbroad); *accord Kilgus v. Cunningham,* 602 F.Supp. 735, 739 (D.N.H.1985) (New Hampshire witness tampering statute not void for vagueness or facially overbroad).

## C. The Pre–Printed Statement

¶ 22 Nozolino contends that his distribution of the pre-printed statement to witnesses Feller and Shrecengost is akin to the public leafleting and commentary identified as "classic forms of speech" in *Schenck v. Pro–Choice Network of W. N.Y.,* 519 U.S. 357, 377, 117 S.Ct. 855, 137 L.Ed.2d 1 (1997). We do not agree that *Schenck* applies.

¶ 23 In *Schenck,* the United States Supreme Court struck down an injunction that established floating buffer zones around people entering and leaving abortion clinics, but upheld fixed buffer zones around doorways, driveways, and driveway entrances. *Id.* at 380, 117 S.Ct. 855. In doing so, the Court held that public leafleting and commenting of the type engaged in by abortion protesters "are classic forms of speech that lie at the heart of the First Amendment, and speech in public areas is at its most protected on public sidewalks." *Id.* at 377, 117 S.Ct. 855. Thus, *Schenck* was concerned with time, place, and manner restrictions on speech in traditional public forums. *Id.* at 377–81, 117 S.Ct. 855.

¶ 24 The circumstances here, however, are much different. Nozolino asked Feller to meet him in private because he wanted to talk "face-to-face" about something. At the meeting, Nozolino told Feller that Nozolino's phone was tapped and that everyone Nozolino spoke to on the phone was subsequently served with a subpoena. Nozolino then told Feller to call him and use a "code word" to indicate whether he had been contacted by law enforcement officials. Nozolino also handed Feller several copies of the preprinted statement and asked Feller to hand them out at Feller's workplace to anyone who knew Nozolino.[2] Feller was later subpoenaed by the grand jury.

¶ 25 After process servers attempted to serve Shrecengost with a subpoena, Shrecengost called Nozolino. Thinking the subpoena related to another matter, Shrecengost asked Nozolino if he knew a lawyer. Nozolino, in turn, told Shrecengost that he was going to

---

**2.** Feller testified that he refused to (1) notify Nozolino if contacted by law enforcement offi-

cials or (2) distribute the pre-printed statement.

leave something for Shrecengost. A copy of the pre-printed statement was later left in a box on Shrecengost's porch and Nozolino "told" or "asked" Shrecengost to look in the box. After looking at the paper, Shrecengost became "extremely uncomfortable," thinking it was an attempt to obstruct justice and "manipulate the way that [he] would speak." Shrecengost ripped up the pre-printed statement.

¶ 26 Unlike the public leafleting addressed in *Schenck*, Nozolino's actions were not directed to the general public, did not occur in a public forum, and did not address issues of general public concern. Rather, Nozolino's pre-printed statement was targeted at specific individuals, distributed privately, and concerned matters of self-interest. We therefore cannot conclude that the distribution of the pre-printed statement to Feller and Shrecengost is equivalent to the leafleting and public commentary addressed in *Schenck*.

¶ 27 Nozolino nonetheless asserts that the pre-printed statement does not attempt to "coerce anyone to testify falsely or unlawfully withhold testimony" but rather "encourages witnesses to exercise their rights." Though framed in terms of free speech, the substance of the argument appears to be that the pre-printed statement does not fall within the conduct proscribed by the witness tampering statute. We do not agree for two reasons.

¶ 28 First, coercion is not an element of witness tampering. *See* § 18–8–707(1)(a); *Cunefare,* 102 P.3d at 305 (identifying elements of witness tampering). Rather, the crime of witness tampering requires an "intentional attempt to interfere with a witness's testimony." *Cunefare,* 102 P.3d at 305. Thus, whether the pre-printed statement was coercive does not bear on whether Nozolino violated the witness tampering statute.

¶ 29 Second, the pre-printed statement informed the witnesses that if compelled to testify "you have a constitutional right to not answer any (or all) questions posed to you" and that the witness could withhold testimony by "stat[ing] that you wish to exert your constitutional rights to remain silent and not incriminate yourself by not answering the question." To be sure, if Shrecengost or Feller had a lawful privilege, the pre-printed statement could, perhaps, be interpreted as lawful persuasion. *See People v. Francois,* 198 Colo. 249, 251 n. 2, 598 P.2d 144, 145 n.2 (1979) ("[I]t would not be violative of the tampering-with-a-witness statute, for example, to persuade a witness to lawfully refuse to testify on grounds of personal privilege."); *see also United States v. Doss,* 630 F.3d 1181, 1190 (9th Cir.2011) (not a violation of federal witness tampering statute for husband to appeal to wife to exercise marital privilege not to testify against him).

¶ 30 But nothing in the record suggests Shrecengost or Feller had a personal privilege not to testify if under valid subpoena. There is no indication that the grand jury was investigating either individual or that they were implicated in a conspiracy with Nozolino. And nothing in the record suggests that either witness was a subject or target of the grand jury. Therefore, Shrecengost and Feller were not in jeopardy of self-incrimination, and thus, neither had a lawful right to refuse to testify. *People v. Ruch,* 2013 COA 96, ¶ 50, —— P.3d —— (right against self-incrimination "may only be invoked when the person asserting the right faces a real danger of compelled self-incrimination").

¶ 31 Because they had no lawful privilege to refuse to testify, if subpoenaed, Shrecengost and Feller were required to testify before the grand jury. *See United States v. Mandujano,* 425 U.S. 564, 581, 96 S.Ct. 1768, 48 L.Ed.2d 212 (1976). By instructing the two witnesses to the contrary, the preprinted statement attempted to induce the witnesses to "unlawfully withhold" testimony in violation of the witness tampering statute. § 18–8–707(1)(a); *Cunefare,* 102 P.3d at 305. We thus conclude that the pre-printed statement falls within the proscriptions of the witness tampering statute and that the statute is not unconstitutional as applied to Nozolino.

## IV. Judicial Recusal

¶ 32 As we read his brief, Nozolino contends that Chief Judge Samelson's failure to

recuse himself from presiding over the grand jury resulted in structural error, requiring reversal of his conviction. We disagree.

### A. The Motion to Dismiss the Indictment

¶ 33 After the grand jury returned its witness tampering indictment, Nozolino moved to dismiss it, arguing that Chief Judge Samelson's failure to recuse from presiding over the grand jury mandated dismissal of the witness tampering charges.

¶ 34 Applying the appearance of impropriety standard, the district court found that Chief Judge Samelson should have recused himself from supervising the grand jury based on the following factors: (1) Chief Judge Samelson's working relationship with Judge Martinez; (2) an affidavit of a county court judge, which stated that "it was common knowledge amongst all of the judges that the Bruce Nozolino Grand Jury hearings were taking place in the El Paso County Courthouse"; and (3) Chief Judge Samelson's knowledge that, roughly one month before the grand jury returned its indictment, Nozolino's truck was parked in the vicinity of his home.

¶ 35 The district court rejected Nozolino's argument that Chief Judge Samelson's failure to recuse constituted structural error. Instead, the district court conducted a harmless error analysis of each order issued by Chief Judge Samelson during the grand jury proceedings. The court concluded that "all orders made by Judge Samelson were appropriate and caused no prejudice to [Nozolino]." Accordingly, the district court denied Nozolino's motion to dismiss the indictment.

¶ 36 Nozolino moved to vacate the order denying his motion to dismiss. After further briefing and a hearing, the court found that "although Judge Samelson should have recused himself in this matter, none of the actions taken was of such a nature as to prejudice [Nozolino] in any manner whatsoever and do not rise to the level of a structural defect warranting the dismissal of the indictment."

### B. Structural and Harmless Error

¶ 37 Even if a defendant demonstrates error during grand jury proceedings, such error does not necessarily warrant reversal of a conviction. *United States v. Mechanik*, 475 U.S. 66, 73, 106 S.Ct. 938, 89 L.Ed.2d 50 (1986). Rather, any error is rendered harmless once a petit jury has reached a guilty verdict. *Id.* at 70–71, 106 S.Ct. 938. Thus, once a defendant is found guilty, dismissal of the indictment—and therefore, reversal of a conviction—is appropriate only where "the structural protections of the grand jury have been so compromised as to render the proceedings fundamentally unfair." *Bank of Nova Scotia v. United States*, 487 U.S. 250, 257, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988). The Supreme Court has recognized only two categories of structural error in the grand jury context, neither of which is present here. *See id.*; *Vasquez v. Hillery*, 474 U.S. 254, 260–264, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986) (racial discrimination in the selection of the grand jurors constitutes structural error); *Ballard v. United States*, 329 U.S. 187, 193, 67 S.Ct. 261, 91 L.Ed. 181 (1946) (gender discrimination).

¶ 38 Assuming, without deciding, that the district court correctly found that Chief Judge Samelson was required to recuse from supervising the grand jury, we conclude that any error was rendered harmless when the petit jury found Nozolino guilty beyond a reasonable doubt. *See Mechanik*, 475 U.S. at 70, 106 S.Ct. 938 (a conviction renders harmless grand jury improprieties); *see also People v. Castro*, 10 P.3d 700, 703 (Colo.App.2000) (whether a judge who presided over a preliminary hearing should have recused herself is mooted by a guilty verdict).

¶ 39 Nozolino also cites *Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868, 877, 129 S.Ct. 2252, 173 L.Ed.2d 1208 (2009), for the proposition that due process required Chief Judge Samelson's recusal because "the probability of actual bias ... [was] too high to be constitutionally tolerable." (Internal quotation marks omitted.) Nozolino, however, does not challenge the district court's factual determination that "there [was] no actual evidence that Judge Samelson had a personal

interest in the outcome of the grand jury proceedings or that he was biased in any way against [Nozolino]."

¶ 40 In any event, due process requires judicial recusal only if a judge (1) has a direct, personal, substantial pecuniary interest in reaching a conclusion against one of the litigants, *Tumey v. Ohio*, 273 U.S. 510, 523, 47 S.Ct. 437, 71 L.Ed. 749 (1927); (2) becomes embroiled in a running, bitter controversy with one of the litigants, *Mayberry v. Pennsylvania*, 400 U.S. 455, 465, 91 S.Ct. 499, 27 L.Ed.2d 532 (1971); or (3) forms a part of the accusatory process by acting as a one-man grand jury by both bringing charges and trying, convicting, and sentencing a party, *In re Murchison*, 349 U.S. 133, 137, 75 S.Ct. 623, 99 L.Ed. 942 (1955). *See Crater v. Galaza*, 491 F.3d 1119, 1131 (9th Cir.2007). And even in these circumstances, a petit jury's conviction renders any error harmless. *Mechanik*, 475 U.S. at 70, 106 S.Ct. 938; *Castro*, 10 P.3d at 703; *cf. People v. Collie*, 995 P.2d 765, 769 (Colo.App.1999) (applying recused judge's pre-trial rulings in the remainder of the proceedings, without an independent review by the replacement judge, does not constitute structural error).

¶ 41 Finally, we are unpersuaded by Nozolino's contention that this case is analogous to *Beckord v. Dist. Court*, 698 P.2d 1323 (Colo. 1985). In *Beckord*, the supreme court held that orders entered by a judge, subsequent to disqualification, were void because the judge was "without jurisdiction" to rule on motions involving an exercise of judicial discretion. *Id. at* 1330. *Beckord* is unhelpful for two reasons. First, it did not involve a grand jury and did not consider the effect of a later conviction by a petit jury. Second, even if *Beckord* could be interpreted to deprive a judge of authority over a matter, nothing in the decision strips the grand jury of its statutory authority to determine whether probable cause exists to indict an individual. *See* § 16–5–204(3)(e), C.R.S.2013 ("[It is t]he duty of the grand jury by an affirmative vote of nine or more members of the grand jury to determine, based on the evidence presented before it, whether or not there is probable cause for finding indictments and to determine the violations to be included in any such indictments."). And there is no dispute that the grand jury—not Chief Judge Samelson—indicted Nozolino.[3] Thus, *Beckord* does not inform our analysis.

## V. Lesser Non–Included Instruction

¶ 42 Nozolino requested that the jury be instructed on disrupting a lawful assembly as a lesser non-included offense. Specifically, he argued that the evidence supported the conclusion that he was "intentionally interfering with the [g]rand [j]ury." The district court denied the request, concluding that such an instruction did not "fit[ ] the facts of the case at all." We perceive no error.

### A. Standard of Review and Governing Law

¶ 43 Because the district court denied Nozolino's instruction on a factual basis, we review for an abuse of discretion. *See People v. Wartena*, 2012 COA 12, ¶¶ 29–30, 296 P.3d 136 (noting that Colorado cases have not conclusively established the standard of appellate review applicable to denials of lesser non-included offense instructions, but concluding that whether the record contains evidentiary support for such an instruction is a factual inquiry reviewed for an abuse of discretion).

¶ 44 A lesser non-included offense instruction is tantamount to a theory of the case instruction. *People v. Skinner*, 825 P.2d 1045, 1047 (Colo.App.1991). Because a defendant is entitled to a theory of the case instruction, a lesser non-included instruction is warranted if it is supported by the evidence, the defendant requests it, and there is a rational basis for the jury to acquit the defendant of the offense charged and simultaneously find him guilty of the lesser offense. *People v. Rivera*, 186 Colo. 24, 28, 525 P.2d 431, 434 (1974); *Skinner*, 825 P.2d at 1047.

¶ 45 A person commits the offense of disrupting a lawful assembly if, "intending to prevent or disrupt any lawful meeting, procession, or gathering, he significantly ob-

---

3. Chief Judge Samelson did not, in fact, sign the indictment.

structs or interferes with the meeting, procession, or gathering by physical action, verbal utterance, or any other means." § 18–9–108(1), C.R.S.2013. The statute is aimed at punishing "actual disruption" and imports a conduct component by requiring that a defendant "significantly" disrupt a meeting or assembly. *Dempsey*, 117 P.3d at 806. Thus, the offense of disrupting a lawful assembly requires conduct that effectively impairs, interferes with, or obstructs a meeting in a "consequential, significant or considerable manner." *Id.* at 806 n. 11 (defining "significant") (internal quotation marks omitted).

### B. The Evidence Presented Did Not Support Giving the Tendered Instruction

¶ 46 Nozolino specifically argues that the tendered lesser non-included offense instruction "would have allowed the jury to convict [him] of interfering with the [g]rand [j]ury if Nozolino believed the advice given in [his] flyer was correct." There is nothing in the record, however, to suggest that Nozolino's actions actually interfered with the grand jury. Nozolino fails to point to anything in the record indicating that the grand jury was hindered by his conduct. Indeed, witnesses Shrecengost and Feller, who received Nozolino's pre-printed statement, both testified before the grand jury. And both stated that they rejected the pre-printed statement's "advice" in favor of testifying. The evidence was therefore insufficient to demonstrate that Nozolino's conduct impaired, interfered, or obstructed the grand jury at all, let alone in a "consequential, significant or considerable manner." *Id.* (internal quotation marks omitted). Accordingly, we conclude that the district court did not abuse its discretion in declining to instruct the jury on the crime of disrupting a lawful assembly.

### VI. Conclusion

¶ 47 The judgment is affirmed in part and reversed in part. The case is remanded to the district court with directions to vacate the conviction and sentence for counts 4 and 5, related to Nozolino's mother and brother, and to enter judgment of acquittal on those two charges.

JUDGE GRAHAM and JUDGE FOX concur.