23CA1702 Peo v Podoba 05-21-2026

COLORADO COURT OF APPEALS

---

Court of Appeals No. 23CA1702
Boulder County District Court No. 22CR143
Honorable J. Keith Collins, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Jeremy Podoba,

Defendant-Appellant.

---

JUDGMENT AFFIRMED, ORDER REVERSED,
AND CASE REMANDED WITH DIRECTIONS

Division VII
Opinion by JUDGE PAWAR
Sullivan and Meirink, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced May 21, 2026

---

Philip J. Weiser, Attorney General, Brian M. Lanni, Senior Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Lisa Weisz, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1    Defendant, Jeremy Podoba, appeals his conviction of various offenses, including assault and witness tampering.  He also appeals the restitution order.  We affirm his convictions, reverse the restitution order, and remand with directions.

## I.    Background

¶ 2    Podoba and his girlfriend, J.M., were involved in a series of verbal and physical altercations over a period of several months from January 2022 to May 2022.  After the first altercation in January, during which Podoba choked J.M., a protection order issued that prohibited Podoba from having any contact with her.

¶ 3    Despite the protection order, J.M. and Podoba continued to see each other.  And during a May incident, Podoba threw J.M. to the ground and broke her collarbone.

¶ 4    The prosecution filed various charges against Podoba based on these altercations.  Less than two weeks before the scheduled trial (it was later continued), Podoba and J.M. had a direct message (DM) exchange during which Podoba wrote, "As long as you don't go to court.  Should be all good."

¶ 5    Ultimately, Podoba was charged with five counts of second degree assault, five counts of violating a protection order, one count

of witness tampering for the DM, and various other counts.  J.M. testified about the alleged assaults at trial and admitted to using physical force against Podoba on various occasions.  The jury found Podoba guilty of two of the five assault counts (based on the January choking incident and the May broken collarbone incident), as well as all the non-assault counts.  Podoba was convicted and sentenced accordingly, and the sentence included a restitution award.

¶ 6     Podoba appeals.  He argues that (1) he was entitled to a self-defense instruction for one of the assault counts; (2) the evidence was insufficient to support the witness tampering conviction; (3) the court erred by admitting various testimony; (4) the prosecutor engaged in misconduct during closing argument; (5) there was cumulative error; and (6) the court improperly ordered restitution.  We disagree with all his arguments except his challenge to the restitution order.

## II.     Self-Defense Instruction

¶ 7     Podoba argues that the trial court erred by denying his request for a self-defense instruction for the assault count based on the collarbone incident.  We disagree.

2

¶ 8     A defendant is entitled to an affirmative self-defense instruction if he presents some credible evidence that he acted in self-defense.  *See* § 18-1-407(1), C.R.S. 2025; *Galvan v. People*, 2020 CO 82, ¶ 24.  As relevant here, a defendant acts in self-defense if he uses a reasonable degree of force to defend himself from what he reasonably believes to be the use or imminent use of unlawful physical force.  § 18-1-407(1).  Therefore, Podoba was entitled to a self-defense instruction if there was any evidence that he reasonably believed he had to throw J.M. to the ground with enough force to break her collarbone to protect himself from her use or imminent use of physical force against him.

¶ 9     We review de novo whether there was any such evidence. *People v. Garcia*, 113 P.3d 775, 784 (Colo. 2005).  Like the trial court, we conclude there was not.

¶ 10    On the night of the collarbone incident, Podoba was at someone else's apartment in Denver.  When J.M. finished work, she noticed that Podoba's phone indicated he was somewhere different than where he said he was.  Suspecting that he was cheating on her, J.M. drove to the Denver apartment.  After they had an argument outside the apartment, Podoba and J.M. agreed to drive

3

their respective vehicles back to Podoba's house. On the way, J.M. bought a pint of tequila and drank a portion of it.

¶ 11    Once back at Podoba's house, the two argued for about ten minutes before Podoba threw J.M. to the ground, breaking her collarbone. J.M. also testified that after she was thrown to the ground, she threw a curling iron at Podoba.

¶ 12    The above description of the incident, which Podoba does not challenge on appeal, includes no evidence that throwing J.M. to the ground was an act of self-defense. Indeed, Podoba urges us to look elsewhere for such evidence, primarily to J.M.'s testimony about two physical altercations that occurred in the days leading up to the collarbone incident.

¶ 13    The first preceding physical altercation occurred about two weeks earlier. J.M. testified that a verbal argument turned physical when Podoba put her in "a headlock from behind." J.M. testified that in response she "put her arm up" and struck him in the eye "in self-defense."

¶ 14    The second preceding physical altercation occurred three days before the collarbone incident. Again, the two were arguing and Podoba threw a butane torch at J.M. J.M. testified that Podoba

physically restrained her in various ways, pinned her up against the wall, and choked her. While being choked, J.M. reached for a knife block that held kitchen knives. J.M. testified that "[s]omehow we ended up both falling on the floor and the knife block fell with us." Although both J.M. and Podoba sustained cuts from the fall with the knives, there was no evidence that J.M. stabbed or threatened Podoba with a knife.

¶ 15    We reject Podoba's argument that these preceding physical altercations supported any reasonable belief that J.M. was about to use unlawful physical force when he threw her down with enough force to break her collarbone. The evidence showed that in both preceding altercations, Podoba initiated the physical part of the altercation, not J.M. Consequently, they might have supported a reasonable belief that J.M. would *respond* to physical force with her own physical force. But it could not have supported a reasonable belief that J.M. would *initiate* physical force. And in the collarbone incident, the evidence was clear that Podoba, not J.M., was the first to use physical force.

¶ 16    Podoba also contests this last proposition: that the evidence was clear that he initiated the physical part of the collarbone

incident. He claims that the evidence was not clear on this point. According to Podoba, the evidence could have been seen as suggesting that J.M. used physical force first because although she testified that she threw the curling iron at him after he threw her down, there was general expert testimony that people sometimes remember events out of order. Therefore, according to Podoba, there was at least some evidence that J.M. threw the curling iron at Podoba first.

¶ 17 Even if we accepted this view of the evidence, it would not be enough to support a self-defense instruction. The degree of force Podoba used (throwing J.M. down with enough force to break her collarbone) was beyond what was reasonably necessary to defend himself from J.M. throwing a curling iron at him, even when considered in the context of J.M.'s past use of physical force against him.

¶ 18 We therefore conclude that Podoba was not entitled to a self-defense instruction for the assault count based on the collarbone incident.

### III.  Witness Tampering

¶ 19    Podoba next argues that the evidence was insufficient to support his witness tampering conviction.  We review the sufficiency of the evidence de novo, *People v. Black*, 2020 COA 136, ¶ 34, and disagree.

¶ 20    When assessing whether the evidence was sufficient, we view it in the light most favorable to the prosecution, giving the prosecution the benefit of all reasonable and fair inferences.  *Id.* The evidence is sufficient if, when viewed this way, it would support a conclusion by a reasonable mind that the defendant is guilty beyond a reasonable doubt.  *People v. Donald*, 2020 CO 24, ¶ 18.

¶ 21    As relevant here, witness tampering requires that the defendant intentionally attempted to induce a witness to testify falsely or unlawfully withhold testimony.  § 18-8-707(1)(a), C.R.S. 2025.  This offense does not require that the witness be under subpoena or legal summons at the time of the alleged inducement. *People v. Cunefare*, 102 P.3d 302, 306-07 (Colo. 2004).

¶ 22    Here, less than two weeks before the scheduled trial, J.M. sent Podoba a DM asking what he had been doing all day and Podoba wrote, "I talked to the lawyer.  Did some account budgeting and

cooked tacos. As long as you don't go to court. Should be all good."

J.M. testified about her understanding of that message, saying

Podoba "was trying to get me to either not come to court or to — or

to work with him and his lawyer on his side of the arguments to

make sure that the cases were dropped." She further explained

that the messages meant that she "would be able to make sure that

[Podoba] didn't end up in jail if I didn't show up to court."

¶ 23    Viewing this evidence in the light most favorable to the

prosecution, a reasonable juror could have fairly inferred that

Podoba was trying to get J.M. to unlawfully withhold trial testimony

that she might have been under subpoena to give. This is all that is

required for witness tampering. *See id.*

¶ 24    Podoba argues otherwise, relying primarily on *People v.*

*Nozolino*, 2014 COA 95. But that reliance is misplaced. In

*Nozolino*, the evidence was insufficient to support witness

tampering because the defendant merely advised witnesses to do

something legal: not cooperate with or speak to police when they

had no legal obligation to do so. *Nozolino*, ¶ 13. In contrast, here,

because Podoba had been charged and his trial was mere days

away, it was likely that J.M. either had been or would be

8

subpoenaed to testify against him. Thus, it was reasonable to infer that Podoba urged J.M. to do something illegal: defy a subpoena to testify at trial. *Id.* at ¶ 9 (a person commits witness tampering if he intentionally attempts to induce a person he believes is to be called to testify as a witness to unlawfully withhold any testimony (citing § 18-8-707(1)(a))). We therefore conclude that the evidence was sufficient to support the witness tampering conviction.

## IV. Alleged Evidentiary Error

¶ 25    Podoba next argues that the trial court erred by admitting various testimony from the prosecution's domestic violence expert and an officer involved in the case. We review the court's evidentiary rulings for an abuse of discretion. *People v. Russell*, 2014 COA 21M, ¶ 22. The parties disagree about whether some of these alleged errors were preserved, which would impact our standard of reversal. *See Hagos v. People*, 2012 CO 63, ¶¶ 12, 14. We need not resolve that disagreement because we conclude that the court did not err in the first place.

### A. Domestic Violence Expert's Testimony

¶ 26    Barbara Lamanna was qualified as an expert in "domestic violence, victim/offender dynamics, counterintuitive victim

9

behaviors and trauma memory." She gave general testimony about these topics, including general comments about strangulation in domestic violence situations.

¶ 27    Podoba argues that the trial court erred by admitting Lamanna's testimony that (1) strangulation causes mostly internal injuries; (2) these injuries can compound with successive strangulations; and (3) strangulation is frightening to the victim. According to Podoba, Lamanna's testimony about internal injuries and successive strangulations was inadmissible because it was beyond the scope of her expertise and the testimony lacked foundation and reliability. He argues that the strangulation-is-frightening testimony was irrelevant. We disagree with all of these arguments.

¶ 28    Expert testimony must be both relevant and reliable. *See People v. Cooper*, 2021 CO 69, ¶ 46. Evidence is relevant if it makes the existence of any material fact more or less probable. *Id.* at ¶ 45. And expert testimony is reliable if the underlying scientific principles are reasonably reliable and the expert is qualified to give the testimony. *Id.* at ¶ 47.

¶ 29    We first address Lamanna's testimony that strangulation causes internal injuries that can compound with successive strangulations.  Lamanna was qualified as an expert in domestic violence and testified that she had worked with approximately 1,500 domestic violence victims, including "lots" who had been strangled, some repeatedly.  Based on her personal experience and expert qualification, Lamanna was qualified to opine about the physical injuries from a domestic violence strangulation.  Likewise, we see no problem with the reliability of or foundation underlying this testimony — Lamanna simply described phenomena that she had seen repeatedly in her professional experience.

¶ 30    We also conclude that Lamanna's testimony that strangulation is frightening was relevant.  As suggested by the scope of her expert qualification, which included counterintuitive victim behaviors, Lamanna described strangulation as frightening when explaining the role it can play in the dynamic of an abusive relationship.  Although J.M. testified that Podoba choked her, the evidence also showed that she subsequently maintained an intimate relationship with him.  Lamanna's testimony provided an explanation for why

11

someone in J.M.'s position would do this, lending credibility to J.M.'s choking allegation even considering her subsequent actions.

## B. Officer's Testimony

¶ 31    Podoba also challenges the admission of an investigating police officer's testimony about what kind of injuries different mechanisms of strangulation cause. This testimony occurred on redirect examination, and we conclude that defense counsel opened the door to its admission during the immediately preceding cross-examination.

¶ 32    In criminal trials, courts try to prevent one party from gaining an unfair advantage through the selective presentation of evidence that creates an incorrect or misleading impression. *Golob v. People*, 180 P.3d 1006, 1012 (Colo. 2008). Thus, when a party first elicits otherwise inadmissible testimony, the opposing party can then elicit additional testimony about the previously inadmissible topic to correct any misleading impressions. *Id.*

¶ 33    The officer here was a lay witness. On cross-examination, defense counsel asked her a series of questions about what kinds of external or visible injuries strangulation can cause. This questioning created the impression that because J.M. had no visible

injuries in the days after the alleged choking, J.M. might not have been strangled.

> Defense counsel: [Referencing a photo of J.M.'s neck] And you didn't see any marks in that picture, correct?
>
> Officer: I could not.
>
> Defense counsel: And then we've heard — and although you've only been an officer for a year or so that it's possible that someone did have some sort of contact injury with their skin such that a couple days later a bruise would come out, correct?
>
> Officer: There could have been.
>
> Defense counsel: Are you familiar with that?
>
> Officer: Yes.
>
> Defense counsel: Okay. But we didn't receive anything like that in this case, correct?
>
> Officer: I'm unaware.

¶ 34    Defense counsel then questioned the officer about a photo of J.M.'s eyes, which counsel pointed out did not show burst blood vessels in the eyes due to strangulation, a condition called petechiae.

> Defense counsel: And in this picture, we can really see the whites of her eyes, correct?
>
> Officer: Yes.

Defense counsel: And you asked her to send that picture of her eyes, did you not, because of this — I was going to say phenomenon or medical condition called petechiae?  Did I say that right, pe-teach-ia?

Officer: Petechiae.

Defense counsel: Petechiae.  And what is petechiae?

Officer: It is when blood vessels of the eyes can burst and make red dots in and around the eye.

Defense counsel: And what causes that?

Officer: Lack of . . . oxygen.

. . . .

Defense counsel: So what you were looking for is red spots on the eyes because you've been trained that that could be evidence that the person had lost their air supply?

Officer: Yes, significant loss of air supply.

¶ 35    The testimony that Podoba challenges on appeal occurred on redirect, immediately after this cross-examination.  In it, the prosecutor merely sought to correct the misleading impression that the absence of visible signs of strangulation, including petechiae, did not necessarily mean that J.M. was not strangled:

14

Prosecutor: [D]o you recognize whether the type or mechanism of strangulation can affect whether there are external marks?

Officer: Yes.

Prosecutor: And how so?

[Defense counsel objection that the court overruled]

Officer: I — based on my training and experience, I have seen if the hands are used and placed around the neck, we usually see bruising from the finger marks. When there's an arm placed around the neck, the force can be applied in a much greater surface area, so there's much less bruising. Usually, we can't see bruising just to the naked eye, so there's usually more internal injury with that than external injury.

¶ 36    Defense counsel was the first to ask the officer to explain, based on her "training" and implicitly her experience, what types of injuries strangulation can cause. This opened the door for the prosecutor to ask the officer to clarify that not all strangulation injuries are external or visible. Because defense counsel opened the door to the testimony challenged on appeal, the trial court did not abuse its discretion by admitting it.

## V. Prosecutorial Misconduct

¶ 37   We review Podoba's argument that some of the prosecutor's comments during closing argument constituted misconduct using a two-step analysis. *Wend v. People*, 235 P.3d 1089, 1096 (Colo. 2010). First, we determine if the prosecutor's comments were improper based on the totality of the circumstances. *Id.* Second, if there was any impropriety, we determine whether it warrants reversal under the applicable standard of review. *Id.*

¶ 38   All of Podoba's prosecutorial misconduct arguments are unpreserved. Therefore, the applicable standard of review here is plain error, which requires that the error be both obvious and substantial. *Hagos*, ¶ 14. An error is substantial if it so undermined the fundamental fairness of the trial that it casts doubt on the reliability of the conviction. *Id.*

¶ 39   We conclude that none of the alleged prosecutorial misconduct warrants relief.

¶ 40   Prosecutors have wide latitude in the language and style they use during closing argument. *People v. McMinn*, 2013 COA 94, ¶ 60. Because closing arguments are not always perfectly scripted, we give prosecutors the benefit of the doubt when their remarks are

ambiguous or inartful. *Id.* A prosecutor may not misstate the law or refer to facts not in evidence. *Id.* at ¶ 62. But a prosecutor may argue all reasonable inferences from the evidence. *Id.*

¶ 41 Podoba challenges three statements the prosecutor made during closing argument. First, he points out that the prosecutor incorrectly asserted that Lamanna had worked with over 4,500 domestic violence victims when the actual number was 1,500. Podoba claims this must have been intentional because two days earlier when Lamanna testified to having worked with 1,500 victims, a different prosecutor asked if it was 1,500 or 15,000, and Lamanna clarified that it was 1,500.

¶ 42 We see no indication in the record that this was an intentional misstatement. Instead, we conclude that it was simply an unintentional and minor misstatement of Lamanna's experience. *See People v. Peters*, 2026 COA 24, ¶ 130 ("A prosecutor may not *intentionally* misstate the evidence." (emphasis added)). But even if it was intentional, we conclude that it does not rise to the level of plain error. Lamanna's experience was unquestionably extensive regardless of how many hundreds of victims she had worked with. We therefore conclude that this misstatement, regardless of

whether it was intentional, did not undermine the fundamental fairness of the trial.

¶ 43    Second, Podoba challenges the prosecutor's following comments about the evidence and, allegedly, the burden of proof:

> Think back to what is not evidence and think back to that burden where you're not to speculate.
>
> You're not to say, hey, what if hypothetically, little green men came down and they're the ones that cause [J.M.] to break her collarbone? That's speculation. That's a vague, imaginary doubt. That's not what reasonable doubt means when you go back and look at the evidence in this case.

The prosecutor added during rebuttal closing: "Please consider what evidence is in evidence that you have received and what has not been provided to you."

¶ 44    Considered in the context of the argument as a whole, we disagree with Podoba's suggestion that these comments implied that he bore a burden of proof. Instead, we conclude that these statements were proper reminders to decide the case based only on the evidence presented. And the prosecutor's use of an example of doubt that is not reasonable (potential involvement of little green men) did not misstate the reasonable doubt standard. *See People v.*

18

*Samson*, 2012 COA 167, ¶ 36 (concluding that prosecutor's use of similar rhetorical flourish did not preclude the jury from finding a reasonable doubt based on the lack of evidence).

¶ 45 Third, Podoba argues that the prosecutor committed misconduct by referring to Podoba's collective actions as a "reign of terror over [J.M.]." We disagree. The evidence in the case suggested that Podoba repeatedly physically assaulted J.M. over a period of months. The characterization of Podoba's actions as a reign of terror was within the prosecutor's wide latitude to use rhetorical flourishes and comment on facts in evidence. *See McMinn*, ¶ 61 (Prosecutors can "employ rhetorical devices and engage in oratorical embellishment.").

## VI. Cumulative Error

¶ 46 Because we have determined that there were not multiple errors at trial, we necessarily reject Podoba's argument that the cumulative effect of alleged errors warrants relief.

## VII. Restitution

¶ 47 Finally, Podoba argues that the trial court erred by entering a restitution award before Podoba received service of the

19

prosecution's request for a specific amount of restitution. The Attorney General agrees, and so do we.

¶ 48 A restitution order is invalid if the defendant is not given notice of the amount of restitution requested and the opportunity to challenge that amount. *People in Interest of J.L.R.*, 895 P.2d 1151, 1153 (Colo. App. 1995). The parties agree that Podoba received neither notice of the amount requested nor the opportunity to challenge it. The record does not suggest otherwise.

¶ 49 The parties also agree that reversal and remand is appropriate. We do too, regardless of whether this issue was or even could have been preserved. Even if plain error review applied, this error would suffice. We therefore reverse the restitution award.

## VIII. Disposition

¶ 50 The restitution order is reversed, and the judgment of conviction is otherwise affirmed. The case is remanded to the trial court with directions to provide Podoba an opportunity to challenge the amount of requested restitution.

JUDGE SULLIVAN and JUDGE MEIRINK concur.